PAUL A. BONIN, Judge.
11A less-than-unanimous jury convicted Telly Hankton of second degree murder of Darnell Stewart.[1] By special pleading in the trial court, Mr. Hankton challenged the constitutionality of those provisions of La. Const, art. I, § 17(A) and La.C.Cr.P. art. 782 A, which allow for jury verdicts in certain specified cases upon the concurring vote of only ten of the twelve jurors.
Mr. Hankton specified two distinct grounds for the unconstitutionality of these provisions. One ground is his argument that the Sixth Amendment, incorporated through the Fourteenth Amendment and applied to the states, requires jury unanimity in state felony trials. The other ground is his argument that, here, La. Const, art. I, § 17(A) and La.C.Cr.P. art. 782 A violate the Equal Protection Clause of the Fourteenth Amendment because racial animus and discrimination toward African-Americans were the substantial or motivating factors in Louisiana’s introduction and first-time adoption of the non-unanimous jury provisions in 1898.
|2With respect to the first ground, because higher judicial authority mandates (and Mr. Hankton acknowledges) that the argument be found to be without merit, we so find. With respect to the second argument, after careful review of the record, we conclude that Mr. Hankton has failed to preserve the issue for appellate review by failing to request an evidentiary hearing on his allegations and therefore do not directly consider the merits of his argument. Moreover, because our appellate review is strictly limited to errors designated in the assignment of errors and to an error discoverable by mere inspection of the pleadings and without inspection of the evidence, and Mr. Hankton has assigned no error respecting the failure of the trial court to conduct an evidentiary hearing and such a failure is not an error patent, we are without jurisdiction to grant any relief on account of the failure to conduct an evidentiary hearing. See La. C.Cr.P. art. 920. Accordingly, we affirm Mr. Hankton’s conviction and sentence.[2]
We explain our decision in greater detail in the following Parts.
I
We begin our explanation by describing the manner in which Mr. Hankton presented his constitutional challenge in the trial court.
First, Mr. Hankton filed a motion to declare that the provisions of La. Const, art. I, § 17(A) and La.C.Cr.P. art. 782 A, which allow less-than-unanimous jury verdicts, are unconstitutional. Article I, § 17(A) of the La. Const, of 1974 separates its criminal jury requirements into three classes according to the penalty |sfor the offense charged. In the first class of *1030 cases, in which the punishment “may be capital,” the jury consists of twelve persons, “all of whom must concur to render a verdict.” Id. In the second class of cases, as here, where the punishment “is necessarily confinement at hard labor,” the jury consists of twelve persons, “ten of whom must concur to render a verdict.” Id. Lastly, in the third class of cases, where punishment “may be confinement at hard labor or confinement without hard labor for more than six months,” the jury consists of six persons, “all of whom must concur to render a verdict.” Id.[3] The pertinent provisions of La.C.Cr.P. art. 782 A are virtually identical to the constitutional provisions for felony-grade offenses.[4] Thus, it is only in the second class of cases (those non-capital felony cases in which the penalty is necessarily confinement at hard labor) that Louisiana law currently provides for less-than-unanimous jury verdicts. And this is the specific provision of the Article and statute which is being assailed by Mr. Hankton.
Because Mr. Hankton was originally indicted by the grand jury with first degree murder, a charge for which the punishment may be capital, jury unanimity would have been required. Second degree murder is a responsive verdict to first degree murder. See La.C.Cr.P. art. 814 A. Notably, in order to acquit of first degree murder and convict of the responsive charge of second degree murder, jury unanimity would be required. See State v. Goodley, 398 So.2d 1068 (La.1981).
|4When, however, the district attorney amended the indictment to charge second degree murder, a unanimous jury verdict was no longer required. See State v. Gilmore, 332 So.2d 789 (La.1976). In light of that development and before the commencement of trial, Mr. Hankton filed a motion to declare the less-than-unanimous provisions unconstitutional. The contents of the motion clearly set out legal, factual, and historical bases for the challenge under the Equal Protection Clause of the Fourteenth Amendment. We specifically detail the allegations in Part III, post.
Apparently concluding that a decision on the motion would be premature because there was no verdict, the trial judge denied the motion without a hearing. Because the motion was in writing, no formal objection to the ruling was necessary. See La. C.Cr.P. art. 841 B (“The requirement of an objection shall not apply to the court’s ruling on any written motion.”)
But before jury deliberations, Mr. Hank-ton next submitted a special requested instruction that “all twelve jurors must agree in order to return any of the four verdicts.” See La.C.Cr.P. art. 807 (“A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.”) Mr. Hank-ton’s counsel advised the trial judge that this request for a special instruction was tied to the earlier motion challenging the constitutionality of the less-than-unanimous jury verdict provisions. The trial judge denied the request, and Mr. Hank-ton timely noted his objection. The jury, ¡¿however, was unable to reach even a less-than-unanimous verdict, and the trial judge declared a mistrial. See La.C.Cr.P. art. 775(2).
*1031 Another jury was impanelled about two months later. No mention was made about either the denied motion or the special requested jury instruction. At the completion of the jury charge, which included an instruction on the requisite ten of twelve jurors’ concurrence for a valid verdict, the trial judge inquired of Mr. Hankton’s counsel if there were any objections to the instructions. Mr. Hankton’s counsel replied without any qualification that there were no objections. See State v. Haarala, 398 So.2d 1093, 1098 (La.1981) (“An alleged error in the jury instruction is not preserved for appeal in the absence of a contemporaneous objection.”); see also La.C.Cr.P. art. 841 A (“It is sufficient that a party, at the time of the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.”)
The jury returned a guilty-as-charged verdict in which only ten jurors concurred. Defense counsel then instantly orally re-urged his claims of unconstitutionality. Cf. State v. Lewis, 10-1775, p. 9 (La.App. 4 Cir. 4/4/12), 96 So.3d 1165, 1172 rev’d on other grounds, 12-1021 (La.3/19/13), 112 So.3d 796 (noting, “because the defendant failed to lodge any pre-verdict objection to the constitutionality of the complained-of provisions, the post-verdict motion for mistrial notwithstanding, he is precluded from assigning such as error on appeal”). The trial judge deferred any consideration of the matter at that time.
1 ^Following the less-than-unanimous jury verdict, Mr. Hankton filed a motion for new trial. See La.C.Cr.P. art. 851(2) (“The court, on motion of the defendant, shall grant a new trial whenever” ... “the court’s ruling on a written motion, or an objection made during proceedings, shows prejudicial error.”); see also State v. Lewis, 10-1775, p. 9, 96 So.3d at 1172 (suggesting that a motion for new trial is the proper procedural vehicle for raising the less-than-unanimous verdict claim). In Mr. Hankton’s motion, he referenced his pretrial motion to declare the provisions and his special jury instruction unconstitutional. Additionally, he noted that the verdict was based upon a 10-2 juror split; thus there is no question that he would have standing to challenge the complained-of provisions of Louisiana law.
The motion for new trial was set for hearing. On the day of the hearing, it was denied. The record is devoid of any request by Mr. Hankton to offer evidence or of any objection by Mr. Hankton with respect to any failure or refusal to allow him to introduce evidence in support of his motions or to prove his factual allegations. Moreover, and importantly, there is no offer of proof or proffer of testimony or evidence to support the allegations of either the original motion or the motion for new trial. See State v. Magee, 11-0574, p. 63 (La.9/28/12), 103 So.3d 285, 327-328, quoting State v. Adams, 537 So.2d 1262, 1265 (La.App. 4th Cir.1989) (“The purpose of an offer of proof is to create a record of the excluded evidence so that the reviewing court will know what the evidence was and will thus be able to determine if the exclusion was improper, and if so, whether the improper exclusion constituted reversible error.”)
Jil
Turning to the substance of Mr. Hank-ton’s constitutional challenges, as we mentioned, Mr. Hankton acknowledges that the Louisiana Supreme Court has foreclosed further consideration of his contention that the Sixth Amendment requires unani- *1032 raous verdicts.[5] See State v. Bertrand, 08-2215, 08-2311, p. 8 (La.3/17/09), 6 So.3d 738, 743 (“With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.”) We too have abided by the Bertrand instruction. See, e.g., State v. Lawrence, 09-1637, p. 18 (La.App. 4 Gir. 8/25/10), 47 So.3d 1003, 1013 (“Suffice it to say that intermediate appellate judges, just like a trial judge, are ‘not at liberty to ignore the controlling jurisprudence of superior courts.’ ”) Consequently, we hold that we can grant Mr. Hankton no relief under this, his first, assignment of error.
m
We now turn in this Part to describe Mr. Hankton’s second assignment of error whereby he argues, as he presents it in his motion to declare the provisions unconstitutional, that the less-than-unanimous jury verdict provisions of Louisiana law violate the Equal Protection Clause of the Fourteenth Amendment, which provides that no state shall “deny to any person within its jurisdiction the equal protection of the laws.”
|sWe agree with Mr. Hankton that the Equal Protection contention raised by him has not yet been substantively addressed by any court and that its consideration is not foreclosed by the Bertrand ruling, see State v. Lewis, 10-1775, p. 8, 96 So.3d at 1171; we find, however, that he has failed to preserve this challenge for our appellate review.
In this Part we first set out verbatim the allegations of Mr. Hankton’s motion and only his motion, but not any embellishments made in his supporting memoranda. See State v. Hatton, 07-2377 (La.7/1/08), 985 So.2d 709 (“Raising a constitutional challenge and particularizing the grounds in a memorandum is insufficient.”) We next explain that Mr. Hankton has failed to present evidence sufficient to establish his assertion of unconstitutionality. Without sufficient evidence in the record to support a ruling of unconstitutionality, we find that the district court committed no error in denying Mr. Hankton’s constitutional challenge.
At this point we emphasize that it is Mr. Hankton’s burden to overcome the presumption of the constitutionality of the challenged provisions. See State v. Overstreet, 12-1854, p. 9 (La.3/19/13), 111 So.3d 308, 314 (“Statutes are generally presumed to be constitutional and the party challenging the validity of the statute bears the burden of proving it is unconstitutional”), quoting Hatton, supra.
When analyzing a constitutional challenge to a statute, we determine whether the challenger has met his burden by using a three-step analysis: 19unconstitutionality must be raised in the trial court, it must be specially pleaded, and the grounds outlining the basis of unconstitutionality must be particularized. See Hatton, 07-2377, p. 14, 985 So.2d at 719. “[T]he purpose of the three step analysis for challenging the constitutionality of a statute is to give the parties an opportunity to brief and argue the constitutional grounds and to prepare an adequate record for review.” Id., 07-2377, p. 18, 985 So.2d at 721 (emphasis added).
Under these circumstances, the party asserting an Equal Protection Clause challenge must establish a racially disproportionate impact and a discriminatory motive on the part of the lawmaker. See Arlington Heights v. Metropolitan *1033 Housing Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Once the party asserting unconstitutionality meets his initial burden, the burden of proof shifts to the other party to show that the same provision would have been enacted absent the established discriminatory intent. See id., 429 U.S. at 270 n. 21, 97 S.Ct. 555; see also Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).
Mr. Hankton, citing Hunter v. Underwood, 471 U.S. 222, 227-228, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), on appeal disputes this burden of proof standard, asserting that the Supreme Court has never held that discriminatory impact is a necessary element to an equal protection claim and that the intent of the drafters is the sole factor that must be established to show present-day unconstitutionality. We find this argument to be without merit. The Supreme Court in Hunter noted that an expert witness had testified as to the discriminatory impact, both at the time of the adoption of the |inprovision and at the time of the decision, and noted that the appellate court “implicitly found the evidence of discriminatory impact indisputable.” Id., 471 U.S. at 227, 105 S.Ct. 1916. The discriminatory impact of the provision was not challenged on appeal. Because the Supreme Court found it necessary to dispense with this factor before considering the convention’s racial bias, we find Mr. Hankton’s contention otherwise to be without merit.
Here follow, concluding at the end of Part III, the precise allegations of Mr. Hankton’s motion with respect to his Equal Protection challenge:
LOUISIANA’S MAJORITY VERDICT SCHEME WAS INTRODUCED FOR THE SUBSTANTIAL PURPOSE OF DISCRIMINATING AGAINST AFRICAN-AMERICANS AND THEREFORE VIOLATED THE FOURTEENTH AMENDMENT.
A statute violates the Fourteenth Amendment when racial discrimination is shown to be a substantial or motivating factor behind its introduction, unless the state can show that the law would have been enacted without the discriminatory motive. [Village of Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Arlington Heights set out five factors that a court should consider in determining whether an enactment was motivated by the substantial purpose of racial discrimination: historical background of the enactment; sequence of events leading to the enactment; legislative history of the enactment; statements by the decision makers; and the discriminatory effect of the enactment.[1]
Majority verdicts were first introduced by legislators in Louisiana in Art. 116 of the Constitution of 1898 as part of a raft of deliberately discriminatory measures.[2] *1034 Put simply, “[t]he desire of Louisiana’s reactionary oligarchies to disenfranchise blacks and poor whites prompted the Constitutional Convention of 1898.” Michael L. Lansza, “Little More than a Family Matter: The Constitution of 1898,” In Search of Fundamental Law: Louisiana’s Constitution, 1812-1974, pp. 93-109 (Warren M. Billings & Edward F Haas, eds. 1993). The majority verdict system was intended invidiously to minimize or cancel out the voting power of African-Americans on juries and to deny African-Americans meaningful participation in the civil institution of jury service.[3] That provision has then been rolled over in each succeeding constitution with only one amendment, increasing the majority from nine out of 12 to 10 out of 12, in the last 110 years.[4]
The 134 delegates in the 1898 Convention were all white and, with the exception of one Republican and one Populist, were all Democrats. Id. at 98-99. The delegates were not at all secretive about their purposes. The President of Louisiana’s 1898 Convention, E.B. Kruttsehnitt, stated in his opening address:
I am called upon to preside over what is little more than a family meeting of the Democratic part of the State of Louisiana. ... We know that this convention has been called together by the people of the State to eliminate from the electorate the mass of corrupt and illiterate voters who have during the last quarter of a century degraded our politics.
Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana, pp. 8-9 (1898).
In closing the Convention, the Hon. Thomas J. Semmes stated that the “mission” of the delegated had been “to establish the supremacy of the white race in this state.” *1035 Id. at 374. In his closing remarks, President Kruttschnitt bemoaned that the delegates had been constrained by the Fifteenth Amendment such that they could not provide “[ujniversal white manhood suffrage and the exclusion from the 113suffrage of every man with a trace of African blood in his veins.” Id. at 380. He went on to proclaim:
I say to you, that we can appeal to the conscience of the nation, both judicial and legislative and I don’t believe that they will take the responsibility of striking down the system which we have reared in order to protect the purity of the ballot box and to perpetuate the supremacy of the Anglo-Saxon race in Louisiana.
Id. at 381.
It was in this atmosphere of hate that Art. 116 was drafted and ratified. Jury trial was abolished for misdemeanors, and reduced to trial by a jury of five for lesser felonies. The requirement of unanimity was removed for all save.capital offenses in cases where hard labor was a necessary punishment: defendants were to be tried before a jury of 12, requiring only nine to concur to render a verdict.
When it passed the majority verdict scheme, the Convention had before it the “Statement of Registered Voters 1897 and 1898” which is contained in the Official Journal itself. See Journal supra, at inserted chart. Blacks represented 14.7% of all citizens registered to vote in Louisiana as of January 1, 1898 (12,902 of 87,240). Id. Proportionate representation on juries would have seen an average of two black jurors per trial. The selection of nine votes for a verdict served to guarantee white majority control over jury verdicts: black votes could be ignored.
In the face of this clear evidence that a substantial motivation for the introduction of majority verdicts was racial discrimination, the burden falls to the state to establish that the law, deviating from Louisiana’s long tradition of unanimous juries, would have passed even without the racial motivation. This, the Instate cannot do.[5] The majority verdict jury trial scheme must therefore be struck down under the equal protection clause of the Fourteenth Amendment.
IV
In this Part we explain that Mr. Hank-ton has on the basis of the allegations, of his motion alone failed to meet his burden of proof in establishing that there is a racial motive behind Louisiana’s less-than-unanimous jury verdict provisions and explain why we conclude that Mr. Hankton has not preserved his Equal Protection challenge for our review on appeal. We explain here that because Mr. Hankton never established his prima facie case, the burden of proof never shifted to the prosecution to show that the 1898 Constitutional Convention would have created a less-than-unanimous jury verdict provision absent the alleged racial animus. Mr. Hank-ton did not put forward an expert witness, *1036 proffer evidence, or timely challenge the errors alleged on appeal. He also did not request an evidentiary hearing, which was the proper procedure for arguing and preserving this constitutional challenge.
[[Image here]]
Mr. Hankton properly challenged the ten-juror-concurrence in his first trial but subsequently failed to preserve this challenge for review on appeal.
1
After a mistrial was declared in Mr. Hankton’s first trial, he failed to re-urge his written motion before his second trial. Mr. Hankton also failed to challenge the composition of the jury before the jury verdict. During voir dire, the judge specifically asked if there were any challenges to the composition of the jury. There, Mr. Hankton had an opportunity to and failed to challenge the voting requirement that would be imposed. Again, during the district court’s instructing the jury that only ten of them concurring would be able to render a verdict, Mr. Hankton had an opportunity to and failed to object. See State v. Smith, 11-0664, pp. 13-14 (La. App. 4 Cir. 1/30/13), 108 So.3d 376, 385 (Allowing the defendant to challenge the composition of the jury post-conviction “would allow the defense to ‘gamble upon receiving a favorable jury verdict’ ” and then challenge the jury only if he is convicted.)
2
Mr. Hankton did not seek an evidentiary hearing in the district court on his allegations. He urges us to accept the experience of Alabama, as decided in Hunter v. Underwood, is self-proving and applicable to his challenge. In this he is mistaken.
[ 1fiLike the district court in State v. Schoening, 00-0903 (La.10/17/00), 770 So.2d 762, where the Supreme Court vacated a judgment declaring La. C.E. art. 615 B(4) unconstitutional, the district court here conducted no hearing. The parties in Schoening did not raise the issue of unconstitutionality themselves; the district court raised the issue by its own motion after Mr. Schoening’s conviction. The constitutional challenge, therefore, was procedurally deficient because it was not brought in a motion by one of the parties. The Supreme Court held that “because there was no contradictory hearing held specifically for the purpose of debating the constitutional question, there is an inadequate record on review concerning the statute’s legislative history, its construction by the courts, and precisely how the statute allegedly offends the Louisiana and/or the United States Constitution.” Id., 00-0903, pp. 5-6, 770 So.2d 762, 766. The Supreme Court also received insufficient evidence to determine whether the district court gave the statute “the strong presumption of constitutionality due it under our law or that the trial court attempted to interpret the statute in a manner so as to sustain its constitutionality before declaring it unconstitutional.” Id., 00-0903, p. 6, 770 So.2d 762, 766.
In State v. Collins, 10-1181, p. 11 (La. App. 4 Cir. 3/23/11), 62 So.3d 268, 275, and State v. Kelly, 2010-0853, p. 8 (La.App. 4 Cir. 12/12/10), 54 So.3d 1159, 1164, we found no merit to the defendants’ claims that the trial court erred in failing to afford them contradictory hearings on their motions for new trial. In each case, this Court noted that the respective records reflected that each defendant submitted his motion without argument, and there was nothing to suggest that 117either defendant intended to call any witnesses or submit any evidence in support of his motion, or that either was prevented from doing so.
*1037 Because Mr. Hankton did not move for a hearing on his motion to declare La. Const, art. I, § 17 and La.C.Cr.P. art. 782 A unconstitutional or assign as error on appeal his lack of a hearing, we find that he has not created an adequate record for us to review his assertion of unconstitutionality.
B
In this subpart we address specific arguments in Mr. Hankton’s memorandum for which there is factual support.[6] We address, first, Mr. Hankton’s argument that the members of the 1898 Constitutional Convention had racial motivations and, second, his argument that the same motivation behind the 1898 Constitution continues today because there have been no substantive intervening amendments.
1
As proof of the 1898 Constitutional Convention’s racial motivation behind less-than-unanimous jury verdicts, Mr. Hank-ton offers excerpts from the 1898 Constitutional Convention, where the delegates expressed their overtly racist intent to exclude African Americans from voting. Mr. Hankton cited the convention’s stated intent: “the exclusion from the suffrage of every man with a trace of African blood in his veins,” “to eliminate from the electorate the mass of corrupt and illiterate voters,” and “to protect the purity of the ballot box.” There was a clearly | ^established racist intent to disenfranchise African American voters through the 1898 Constitution. Here, however, the issue is not disenfranchisement; the issue here is less-than-unanimous jury verdicts.
As the prosecution acknowledges, the 1901 Alabama constitutional provision on disenfranchisement, which is considered in Hunter v. Underwood, is strikingly — and regrettably — similar to the 1898 Louisiana constitutional provision on disenfranchisement. But Hunter v. Underwood was not decided on mere allegations. As the Court importantly noted, “[ajlthough understandably no ‘eyewitnesses’ to the 1901 proceedings testified, testimony and opinions of historians were offered and received without objection.” Hunter v. Underwood, AH U.S. at 228-229, 105 S.Ct. 1916 (emphasis added). In addition to the testimonies of two historians, the proceedings of the constitutional convention and several historical studies were accepted as evidence, all of which together, “showed that the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks.” Id. at 229, 105 S.Ct. 1916.
Less-than-unanimous jury verdict systems are not per se discriminatory. Oregon’s constitution also allows less-than-unanimous jury verdicts, see Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), and Mr. Hankton concedes that Oregon’s provision is not based on racial motivation. Mr. Hankton, therefore, cannot rely on mere argument and historical documents referring to intentional disenfranchisement without expert testimony to tie the racial animus behind voting restrictions to a similar racial animus behind Article 116, specifically.
| iaWhile Mr. Hankton may-have established racial motivation behind the 1898 constitutional provisions on voting, he has not established that every difference between the 1898 Constitution and the 1879 Constitution is the product of racial animus. ■
2
In Mr. Hankton’s memorandum, he concludes only in a footnote that the subse *1038 quent constitutions have not changed the less-than-unanimous jury requirement, and therefore, the original racial animus continues to this day. We disagree.
The revision of a less-than-unanimous jury requirement in the 1974 Constitution was not by routine incorporation of the previous Constitution’s provisions; the new article was the subject of a fair amount of debate. In that debate no mention was made of race. The stated purpose behind the latest iteration of the less-than-unanimous jury verdict provision is judicial efficiency. We also emphasize here that the 1974 Constitution was adopted by a vote of the people. And in that regard Mr. Hankton has not even suggested that an objectionable appeal on the basis of race was promoted to the public in order to obtain their consent to the revised less-than-unanimous jury verdict authorized by the 1974 Constitution.
Mr. Hankton asserted, incorrectly, that the constitutional provision reviewed in Hunter had been reenacted by subsequent constitutional conventions; however, that was not the case. Alabama was still using its 1901 constitution at the time | ^Hunter was decided; therefore, inquiry into the racial animus of the drafters of Alabama’s 1901 constitution was relevant. See Hunter, 471 U.S. at 223, 105 S.Ct. 1916.
We are not presented with such a straightforward inquiry into the intent of the lawmakers as was the Supreme Court in Hunter. Louisiana is not still using its 1898 constitution, nor has Article 116 of the 1898 Constitution been adopted without change through the succeeding Constitutions. In our review of the legislative history of this challenged constitutional provision, we have found that the general electorate of Louisiana did not vote on the approval the 1898, 1913, or 1927 Constitutions. The last constitution that was approved by the people before the 1974 Constitution was in 1879. Both the 1913 and 1927 Constitutions reproduced nearly verbatim the provisions of Article 116 of the 1898 Constitution relating to less-than-unanimous jury verdicts.[7] All other jury provisions, including the requirement that nine out of twelve jurors concur when the punishment is necessarily at hard labor, remained constant until the 1974 Constitution.
Louisiana’s 1973 Constitutional Convention debated the issue of less-than-unanimous jury verdicts when it changed the required number of jurors concurring from nine out of twelve to ten out of twelve, and nowhere in the discussion is race mentioned. As originally proposed, Article I, § 17 of the 1974 Constitution read as follows:
_|2jAny person charged with an offense or set of offenses punishable by imprisonment of more than six months may demand a trial by jury. In cases involving a crime necessarily punishable by hard labor, the jury shall consist of twelve persons all of whom must concur to render a verdict in capital cases or cases in which no parole or probation is permitted, and ten of whom must agree in others. In cases not necessarily punishable by hard labor, the jury may consist of a smaller number of persons, all of whom must concur to render a verdict. The accused shall have the right *1039 to voir dire and to challenge jurors peremptorily. (emphasis added)
Louisiana Constitutional Convention, September 8, 1978, 44th Day of Proceedings.
Importantly, the initial proposal was not a restatement of the 1898 Constitutional provision, and the prior provision was not adopted by the new Constitution out of formality. The proposal extended the unanimity requirement, previously only applicable to capital cases, to cases, like Mr. Hankton’s, that were necessarily punishable at hard labor and for which parole or probation were unavailable. The delegates of the Constitutional Convention, therefore, contrary to Mr. Hankton’s assertion, expressly considered and rejected requiring unanimous jury verdicts in Mr. Hankton’s specific situation.
Delegate Chris J. Roy, Sr. of Alexandria, a prominent Louisiana attorney,[8] vice-chairman of the convention, and chairman of the committee on bill of rights and elections, was the major proponent for expanding constitutional requirement for unanimous juries. His principal opponent on unanimity and the most vocal advocate for retaining the nine-out-of-twelve requirement was Delegate I. Jackson Bur-son, Jr., a Eunice attorney and at the time an assistant district attorney in St. [22Landry Parish. Delegate Walter Lanier, Jr., of Thibodaux, an assistant district attorney in Lafourche Parish, who later served as a city, a district and an appellate judge, endeavored to achieve a compromise.
During the debate on September 8, 1973, Mr. Roy forcefully argued:
If you believe that conviction beyond a reasonable doubt means something more than just convicting; and I say to you that where one can be convicted and twenty-five percent of those who try him believe he is not guilty, then that is not beyond reasonable doubt.... In cases in which no parole or probation is permitted, you must have twelve out of twelve. We are attempting to change the law there. Presently under the armed robbery statute, one may be convicted by nine out of twelve people, which is only seventy-five percent and in my judgment not beyond reasonable doubt and may be sentenced to as long as ninety-nine years in the state penitentiary without benefit of parole or probation. So in that type of case, and that’s the only case presently that we have that the legislature says that no parole or probation will be permitted, then it would require twelve out of twelve to convict. In all other cases where there may be nine out of twelve to convict, we now provide ten out of twelve.... Louisiana and the State of Oregon are the only two states again in the whole United States and in the whole federal system that allows one to be convicted by nine out of twelve votes of a twelve-man jury. Ladies and gentlemen, nine out of twelve is three-fourths, three-fourths of a hundred is seventy-five. If a hundred of us here today are asked, did so and so do something beyond reasonable doubt and twenty-five out of a hundred say he did not, I submit to you, he has not been convicted beyond reasonable doubt as I appreciate the term.... My point and the committee’s point is that if the rest of the United States can require unanimous verdicts and the federal system can require unanimous verdicts, why can’t we in Louisiana require at least five-sixths verdicts to convict?
*1040 We ask you to consider what “beyond reasonable doubt” means. If it means to you, that it takes only seventy-five percent to send a man to Angola or anywhere else for ninety-nine years for any case except — you understand capital crimes you may convict with only nine out of ^twelve — if that’s what you want to do, then do it. But let’s not say that you weren’t warned. Let’s not argue about ten out of twelve being too much to ask for.
In arguing that the stricter concurrence requirements would not result in an overwhelming number of criminal trials, Mr. Roy cited statistics from criminal courts around Louisiana showing that extremely few cases actually go to trial. One of the statistics cited was from St. Landry Parish, where, according to Mr. Roy, only eight criminal jury trials had taken took place in 1972 but 2,993 cases had been resolved by judges. In a spirited debate, Mr. Burson challenged Roy’s argument:
Mr. Burson: Mr. Roy, do you know that I didn’t become an assistant district attorney until 1973 and those statistics are from 1972? Do you know that I’ve tried five jury trials in two weeks early this spring? But seriously, isn’t it true that the United States Supreme Court last year in the case of State v. Johnson was confronted with the issue that you’ve raised as to whether or not the Louisiana Constitutional Provision permitting the jury nine out of twelve to return a guilty verdict beyond a reasonable doubt? Didn’t the U.S. Supreme Court uphold this as constitutional?
Mr. Roy: Mr. Burson, I never lie about facts, you’re correct. But my point is that it does not amount to beyond reasonable doubt in my judgment and hopefully in the judgment of the rest of these people here.
Mr. Burson: But your judgment in that case would be at variance with the judgment of the United States Supreme Court.
Mr. Roy: Well, it certainly is and I’m the delegate here, and I’m not in the U.S. Supreme Court. I want to say that I think there will probably be a lot more criminal trials in St. Landry Parish since Mr. Burson is there.
124O11 the following day, Delegate Lanier took the floor of the Convention to explain a compromise proposal, which was adopted by the delegates and ultimately the voters:
Mr. Chairman and fellow delegates, this amendment is the result of a synthesis of ideas by various of the proponents and opponents of different shades of the way this thing should be handled.
This amendment makes three changes in the present law and four changes in the present constitution. And I want to explain to you the differences here.

The present law, in our constitution which is Article VII, Section 4-1, and also, in Article 782 of the Code of Criminal Procedure, provides that in cases necessarily punishable at hard labor the jury shall be composed of twelve persons, nine of whom must concur to render a verdict.

We have changed this to ten. This proposal of having less than a majority to reach a verdict in the case has been approved by the United States Supreme Court; this issue of whether you need a unanimous verdict in all cases has been reviewed by the Supreme Court, and you may have less than a unanimous verdict. It then becomes a question of degree ... at what point to do draw the line? Do you draw it at eight, or nine, or ten ... we felt, after putting all of our heads together, that ten was a reasonable amount on this. It leads to a *1041 situation where you’ll get a definitive action in more cases rather than have a hung jury. Because if it required twelve out of twelve to render a verdict, that means if you had anything less than twelve out of twelve, either for innocence or for guilt, you would have what’s called a hung jury, and that means that you would have to go back and do it all over again. And this is one of the modernizations of our criminal procedure, quite frankly of which Louisiana is one of the leaders in the field, (all emphasis added)
Louisiana Constitutional Convention, September 8, 1973, 44th Day of Proceedings.
Even if racial bias was the original motive behind the less-than-unanimous jury verdict’s introduction in 1898, the motive in 1973 was clearly judicial efficiency. As Mr. Lanier explained, the delegates debated the final form of this ^provision, and the current version of the Article is the result of a synthesis of various ideas from many different delegates.
We, therefore, are not dealing with an issue squarely on point with Hunter, where there were no intervening constitutional conventions or amendments to the challenged provision. The actual constitutional provision and statutory procedure under which Mr. Hankton’s trial was conducted was not the 1898 provision and procedure. Thus, even if we accept that the concept of a less-than-unanimous verdict may have had its genesis in Louisiana in provisions adopted by a white supremacist convention, the provision under which Mr. Hankton’s trial was conducted is at best an attenuated version and likely, based upon our review of the 1973 constitutional convention proceedings, unrelated to any racial supremacist designs.
But we need not further discuss this complex new issue because Mr. Hankton failed to meet his burden of proof in establishing his constitutional challenge. The burden of proof, therefore, never shifted to the prosecution to prove that the provision would have been enacted absent the racial animus behind the 1898 Constitution.
C
Mr. Hankton has not presented any evidence that La. Const, art. I, § 17 or La. C.Cr.P. art. 782 as applied to him have a disparate impact. He has not alleged much less established that the service of African-Americans on Orleans Parish petit juries at the time of his trial was disproportionate to their venire inclusion, their 12fiVoter registration, or even their overall share of the eligible population of the parish such that the less-than-unanimous verdict would have a disparate impact on the outcome of their service on petit juries. We could only speculate — with difficulty— that there could be such disparate impact existing in a parish in which 60.2% of the residents identified as African-American. See 2010 United States Census Bureau statistics.
Again, however, because Mr. Hankton has not met his initial burden of proof of demonstrating disparate impact, the burden has not shifted to the prosecution to show that the provision would have been enacted absent a racial animus.
CONCLUSION
As we have noted, the Louisiana Supreme Court decision State v. Bertrand prevents us from granting Mr. Hankton any relief based on his Sixth Amendment challenge. Regarding Mr. Hankton’s assertion that the less-than-unanimous jury verdicts violate the Equal Protection Clause of the Fourteenth Amendment, we find that he has failed to preserve evidence in the record sufficient for us to determine that he has overcome the presumption of constitutionality. Therefore, we can grant *1042 no relief to Mr. Hankton under either of the two errors assigned by him.
DECREE
The second degree murder conviction of Telly Hankton for the killing of Darnell Stewart is affirmed as is his sentence of imprisonment for the balance of his natural life.
AFFIRMED
LOVE, J., concurs and assigns reasons.

. See La. R.S. 14:30.1 A. The trial judge imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. See La. R.S. 14:30.1 B.

. We have, as we do in every criminal appeal from a conviction or sentence, inspected the record for errors patent but have detected none. See La.C.Cr.P. art. 920(2).

. Also see Burch v. Louisiana, 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979).

. The sole exception is the absence of a provision in Article 782 A for the so-called one-year misdemeanor. That exception is handled in La.C.Cr.P. art. 779 A. See Duncan v. Louisiana, 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and Ballew v. Georgia, 435 U.S. 223, 243-244, 98 S.Ct. 1029, 55 L.Ed.2d 234(1978).

. Mr. Hankton relates that he urges this issue to preserve it for further, review by the Louisiana Supreme Court or the United States Supreme Court.

 The United States Supreme Court has not hesitated to strike down post-reconstruction era statutes that were initially passed with a discriminatory purpose. In Hunter v. Underwood, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), the Court held that Art. CIII, § 182 of the Alabama Constitution of 1901, a provision disenfranchising misde-meanants, violated the equal protection clause of the Fourteenth Amendment under Arlington Heights, despite the provision’s facial neutrality. In John B. Knox, the president of the Alabama Constitutional Convent, had revealed the discriminatory purpose of the 1901 Constitution in his opening address: "And what is it that we want to do? Why it is within the limits imposed by the Federal Constitution, to establish white supremacy in this State.” Id., at 228-229, 105 S.Ct. 1916. And Alabama in 1901 was no different than Louisiana during the same time period. As the Court in Hunter noted, "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks.” Id.

Article 116 (La. Const.(1898)) read as follows:
The General Assembly shall provide for the selection of competent and intelligent jurors. Ail cases in which the punishment may not be at hard labor shall, until otherwise provided by law, which shall not be prior to 1904, be tried by the judge without a jury. Cases in which the punishment by be at hard labor shall be tried by a jury of five, all of whom must concur to render a verdict; cases in which the punishment is necessarily at had [sic] labor, by a jury of twelve, nine of whom concurring may render a verdict; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to tender [sic] a verdict.

From its creation until the end of Reconstruction and the withdrawal of federal troops. The State of Louisiana provided for the common law right to trial by jury, including unanimity in jury | ^verdicts. By the Act of 1805, the Territory of Orleans adopted the forms and procedures of the common law of England in its criminal proceedings, including “the method of trials." Act of 1805, § 33; see generally A Treatise on the Criminal Jurisprudence of Louisiana, Bloomfield & Steel (1860), p. 3-10.

Non-unanimity came to be considered by the United States Supreme Court in two cases with significantly different procedural histories. Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). The Sixth Amendment claim was not reached in Johnson, which dealt with verdicts by nine of 12 jurors, but the Supreme Court in Apodaca ruled that verdicts by 10 of 12 jurors were constitutional. In the wake of Apodaca and Johnson, the Louisiana majority verdict provision was amended in the Constitution of 1974 to provide for a majority vote of 10, rather than nine. This sort of minor amendment in no way changes the analysis of the legislative intent of the provision when introduced in 1898. In Hunter, the Alabama case cited in n. 2, supra, the scope of the disqualifications created by § 182 had been substantially reduced by a subsequent tweaking that was not understood the alter the original intent of the provision.

 Commentators have also noted that the "majority-rule” authorized by non-unanimous verdicts has an insidious discriminatory impact. Recent social science research has demonstrated that non-unanimous verdicts significantly constrict the flow of information within jury deliberations and shorten deliberations overall, leading to less accurate judgments, and reducing the likelihood that jurors will hear, request, or vigorously challenge each other’s views. Crucially, a minority viewpoint can simply be ignored in a non-unanimous setting, and generally is. It has been suggested that non-unanimous voting schemes are likely to chill participation by the precise groups whose exclusion the' Court has proscribed in other contexts. See Kim TaylorpThompson, Empty Votes in Jury Deliberations, 113 Harv.L.Rev. 1261, 1276-1277 (2000) (citing and describing relevant social science studies); Valerie P. Hans, The Power of Twelve: The Impact of Jury Size and Unanimity on Civil Jury Decision Making, 4 Del. L.Rev. (2001).

. The factual support for these arguments are the Constitutional Convention of 1898 and the various Constitutions of the State of Louisiana.

. The only change made by the 1913 Constitution was the addition of the sentence "All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, be tried by the judge without a jury.” The only substantive change in the 1927 Constitution from the 1913 Constitution with respect to the composition of juries is that women were not to be drawn for jury service unless they first express their desire for such service by filing a notice with clerk of District Court. See La. Const, of 1927, Art. VII, § 41.

. See Lewis, 10-1775, p. 5, 96 So.3d at 1178 (Bonin, J., dissenting) (for Chris Roy’s constitutional convention discussion of the meaning and purpose of "voir dire").