Justice ALITO, concurring.
I join the opinion of the Court in full. The basis of the decision below was a Montana constitutional provision that, according to the Montana Supreme Court, forbids parents from participating in a publicly funded scholarship program simply because they send their children to religious schools. Regardless of the motivation for this provision or its predecessor, its application here violates the Free Exercise Clause.
Nevertheless, the provision's origin is relevant under the decision we issued earlier this Term in Ramos v. Louisiana , 590 U.S. ----, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020). The question in Ramos was whether Louisiana and Oregon laws allowing non-unanimous jury verdicts in criminal trials violated the Sixth Amendment. The *2268 Court held that they did, emphasizing that the States originally adopted those laws for racially discriminatory reasons. See id. , at ---- - ----, 140 S.Ct., at 1391-1395. The role of the Ku Klux Klan was highlighted. See ibid . ; see also id. , at ----, 140 S.Ct., at 1410 (SOTOMAYOR, J., concurring in part); id. , at ----, 140 S.Ct., at 1417 (KAVANAUGH, J., concurring in part).
I argued in dissent that this original motivation, though deplorable, had no bearing on the laws' constitutionality because such laws can be adopted for non-discriminatory reasons, and "both States readopted their rules under different circumstances in later years." Id. , at ----, 140 S.Ct. at 1426. But I lost, and Ramos is now precedent. If the original motivation for the laws mattered there, it certainly matters here.
The origin of Montana's "no-aid" provision, Mont. Const., Art. X, § 6 (1) (1972), is emphasized in petitioners' brief and in the briefs of numerous supporting amici . See Brief for Petitioners 31-45; Brief for United States as Amicus Curiae 1-2, 25; Brief for Center for Constitutional Jurisprudence as Amicus Curiae 10-12; Brief for Pioneer Institute, Inc., as Amicus Curiae 5-17; Brief for Cato Institute as Amicus Curiae 2; Brief for State of Oklahoma et al. as Amici Curiae 16; Brief for Montana Catholic School Parents et al. as Amici Curiae 21-25; Brief for Senator Steve Daines et al. as Amici Curiae 1-27 (Sen. Daines Brief); Brief for Becket Fund for Religious Liberty as Amicus Curiae 4-20 (Becket Fund Brief); Brief for the Rutherford Institute as Amicus Curiae 2-10; Brief for Georgia Goal Scholarship Program, Inc., as Amicus Curiae 1-5, 16-21; Brief for Liberty Justice Center et al. as Amici Curiae 16-17; Brief for Alliance for Choice in Education as Amicus Curiae 4-8; Brief for Independence Institute as Amicus Curiae 4-26 (Independence Institute Brief); Brief for Jewish Coalition for Religious Liberty as Amicus Curiae 1-5; Brief for Rusty Bowers et al. as Amici Curiae 8-9; Brief for Center for Education Reform et al. as Amici Curiae 21-27 (CER Brief); Brief for Montana Family Foundation as Amicus Curiae 9-13; Brief for Arizona Christian School Tuition Organization et al. as Amici Curiae 14-22; Brief for Justice and Freedom Fund et al. as Amici Curiae 22-23; Brief for 131 Current and Former State Legislators as Amici Curiae 2-10.
These briefs, most of which were not filed by organizations affiliated with the Catholic Church, point out that Montana's provision was modeled on the failed Blaine Amendment to the Constitution of the United States. Named after House Speaker James Blaine, the Congressman who introduced it in 1875, the amendment was prompted by virulent prejudice against immigrants, particularly Catholic immigrants. In effect, the amendment would have "bar[red] any aid" to Catholic and other "sectarian" schools. Mitchell v. Helms , 530 U.S. 793, 828, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion). As noted in a publication from the United States Commission on Civil Rights, a prominent supporter of this ban was the Ku Klux Klan.[1]
The Blaine Amendment was narrowly defeated, passing in the House but falling just short of the two-thirds majority needed in the Senate to refer the amendment to the States. See 4 Cong. Rec. 5191-5192 (1876) (House vote); id. , at 5595 (28 yeas, 16 nays in the Senate). Afterwards, most *2269 States adopted provisions like Montana's to achieve the same objective at the state level, often as a condition of entering the Union. Thirty-eight States still have these "little Blaine Amendments" today. See App. D to Brief for Respondents.
This history is well-known and has been recognized in opinions of this Court. See, e.g. , Locke v. Davey , 540 U.S. 712, 723, n. 7, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ; Mitchell , 530 U.S. at 828-829, 120 S.Ct. 2530 (plurality opinion); see also ante , at 2258 - 2259; Zelman v. Simmons-Harris , 536 U.S. 639, 720-721, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (BREYER, J., dissenting). But given respondents' and one dissent's efforts to downplay it in contravention of Ramos , see Brief for Respondents 16-23; post , at 2293 - 2294, n. 2 (SOTOMAYOR, J., dissenting), it deserves a brief retelling.
A wave of immigration in the mid-19th century, spurred in part by potato blights in Ireland and Germany, significantly increased this country's Catholic population.[2] Nativist fears increased with it. An entire political party, the Know Nothings, formed in the 1850s "to decrease the political influence of immigrants and Catholics," gaining hundreds of seats in Federal and State Government.[3]
Catholics were considered by such groups not as citizens of the United States, but as "soldiers of the Church of Rome,"[4] who "would attempt to subvert representative government."[5] Catholic education was a particular concern. As one series of newspaper articles argued, " 'Popery is the natural enemy of general education.... If it is establishing schools, it is to make them prisons of the youthful intellect of the country.' " C. Glenn, The Myth of the Common School 69 (1988) (Glenn) (quoting S. Morse, Foreign Conspiracy Against the Liberties of the United States (1835)). With a Catholic school breaking ground in New York City, the New York Times ran an article titled "Sectarian Education. Anti-Public School Crusade. Aggressive Attitude of the Roman Catholic Clergy-The Terrors of the Church Threatened." N. Y. Times, Aug. 24, 1873, p. 8. The project, the article concluded, would cause "intense anxiety by all who are interested in upholding the admirable system of public school education." Ibid .
The feelings of the day are perhaps best encapsulated by this famous cartoon, published in Harper's Weekly in 1871, which depicts Catholic priests as crocodiles slithering hungrily toward American children as a public school crumbles in the background:
*2270 The resulting wave of state laws withholding public aid from "sectarian" schools cannot be understood outside this context. Indeed, there are stronger reasons for considering original motivations here than in Ramos because, unlike the neutral language of Louisiana's and Oregon's nonunanimity rules, Montana's no-aid provision retains the bigoted code language used throughout state Blaine Amendments.
The failed Blaine Amendment would have prohibited any public funds or lands devoted to schooling from "ever be[ing] under the control of any religious sect." 4 Cong. Rec. 205 (1875). As originally adopted, Montana's Constitution prohibited the state and local governments from "ever mak[ing,] directly or indirectly, any appropriation" for "any sectarian purpose" or "to aid in the support of any school ... controlled in whole or in part by any church, sect or denomination whatever." Mont. Const., Art. XI, § 8 (1889). At the time, "it was an open secret that 'sectarian' was code for 'Catholic.' " Mitchell , 530 U.S. at 828, 120 S.Ct. 2530 (plurality opinion). Dictionaries defined a "sectarian" as a member "of a party in religion which has separated itself from the established church, or which holds tenets different from those of the prevailing denomination in a kingdom or state"-a heretic. N. Webster, An American Dictionary of the English Language (1828); see also Independence Institute Brief 9-16 (collecting several similar definitions). Newspapers throughout the country, including in Montana, used the word in similarly pejorative fashion. See id., at 17-26 (collecting several articles). The term was likewise used against Mormons and Jews.[6]
Backers of the Blaine Amendment either held nativist views or capitalized on them. When Blaine introduced the amendment, The Nation reported that it was "a Constitutional amendment directed against the Catholics"-while surmising that Blaine, whose Presidential ambitions were known, sought "to use it in the campaign to catch anti-Catholic votes."[7] The amendment *2271 had its intended galvanizing effect. "Its popularity was so great" that "even congressional Democrats," who depended on Catholic votes, "were expected to support it," and the congressional floor debates were rife with anti-Catholic sentiment, including "a tirade against Pope Pius IX."[8]
Montana's no-aid provision was the result of this same prejudice. When Congress allowed Montana into the Union in 1889, it still included prominent supporters of the failed Blaine Amendment. See Sen. Daines Brief 10-13. The Act enabling Montana to become a State required "[t]hat provision shall be made for the establishment and maintenance of systems of public schools ... free from sectarian control." Act of Feb. 22, 1889, § 4, 25 Stat. 677; see also Becket Fund Brief 17-18 (quoting one Senator's description of the Act as " 'completing the unfinished work of the failed Blaine Amendment' "). Montana thereafter adopted its constitutional rule against public funding for any school "controlled" by a "sect." Mont. Const., Art. XI, § 8 (1889). There appears to have been no doubt which schools that meant. As petitioners show, Montana's religious schools-and its private schools in general-were predominantly Catholic, see Brief for Petitioners 42, and n. 41, and anti-Catholicism was alive in Montana too. See, e.g. , Sen. Daines Brief 1-3 (describing a riot over an anti-Catholic sign hung over a Butte saloon on Independence Day, 1894).
Respondents argue that Montana's no-aid provision merely reflects a state interest in "preserv[ing] funding for public schools," Brief for Respondents 7, known as "common schools" during the Blaine era. Yet just as one cannot separate the Blaine Amendment from its context, "[o]ne cannot separate the founding of the American common school and the strong nativist movement."[9]
Spearheaded by Horace Mann, Secretary of the Massachusetts Board of Education from 1837 to 1848, the common-school movement did not aim to establish a system that was scrupulously neutral on matters of religion. (In a country like ours, that would have been exceedingly difficult, if not impossible.) Instead the aim was to establish a system that would inculcate a form of "least-common-denominator Protestantism."[10] This was accomplished with daily reading from the King James Bible, a curriculum that, Mann said, let the book "speak for itself." 4 Life and Works of Horace Mann 312 (1891) (Mann's 12th annual report on the Massachusetts schools; emphasis deleted). Yet it was an affront to many Christians and especially Catholics, not to mention non-Christians.[11]
Mann's goal was to "Americanize" the incoming Catholic immigrants. In fact, he and other proponents of the common-school movement used language and made insinuations that today would be considered far more inflammatory. In his 10th annual report on the Massachusetts schools, Mann described the State as "parental,"
*2272 assuming the responsibility of weaning children "[f]or the support of the poor, nine-tenths of whose cost originate with foreigners or come from one prolific vice," meaning alcohol. 4 Life and Works of Horace Mann, at 132, 134 (emphasis deleted). In other writing, he described the common-school movement as " 'laboring to elevate mankind into the upper and purer regions of civilization, Christianity, and the worship of the true God; all those who are obstructing the progress of this cause are impelling the race backwards into barbarism and idolatry.' " Glenn 171-172 (quoting an 1846 article by Mann in the Common School Journal).
These "obstructers" were Catholic and other religious groups and families who objected to the common schools' religious programming, which, as just seen, was not neutral on matters of religion. Objections met violent response. In Massachusetts and elsewhere, Catholic students were beaten and expelled for refusing to read from the King James Bible.[12] In New York, a mob destroyed the residence of Bishop John Hughes, who had argued that, if the State was going to fund religious public education, it should also support church schools. The militia needed to be called to protect St. Patrick's Cathedral.[13] Most notorious were the Philadelphia Bible Riots. In 1844, a rumor circulated in the city's nativist newspapers that a school director, who was Catholic, had ordered that Bible reading be stopped.[14] Months of scaremongering broke out into riots that left two of the city's Catholic churches burned and several people dead. Only by calling out the militia and positioning a cannon in front of a Catholic church-which itself had been taking cannon fire-were the riots ultimately quelled.[15]
Catholic and Jewish schools sprang up because the common schools were not neutral on matters of religion. "Faced with public schools that were culturally Protestant and with curriculum[s] and textbooks that were, consequently, rife with material that Catholics and Jews found offensive, many Catholics and Orthodox Jews created separate schools," and those "who could afford to do so sent their children to" those schools.[16]
But schools require significant funding, and when religious organizations requested state assistance, Mann and others labeled them "sectarian"-that is, people who had separated from the prevailing orthodoxy. See, e.g. , Jeffries & Ryan 298, 301. The Blaine movement quickly followed.
In 1854, the Know Nothing party, in many ways a forerunner of the Ku Klux Klan,[17] took control of the legislature in Mann's State of Massachusetts and championed one of the first constitutional bans on aid to "sectarian" schools (along with attempting to limit the franchise to native-born *2273 people). See Viteritti, Blaine's Wake 669-670.
Respondents and one dissent argue that Montana's no-aid provision was cleansed of its bigoted past because it was readopted for non-bigoted reasons in Montana's 1972 constitutional convention. See post , at 2293 - 2294, n. 2 (opinion of SOTOMAYOR, J.); see also Brief for Respondents 18; Tr. of Oral Arg. 22-23. They emphasize that the convention included Catholics, just as the constitutional convention that readopted Louisiana's purportedly racist non-unanimous jury provision included black delegates. As noted, a virtually identical argument was rejected in Ramos , even though " 'no mention was made of race' " during the Louisiana convention debates. 590 U.S., at ----, 140 S.Ct., at 1426 (ALITO, J., dissenting) (quoting State v. Hankton , 2012-0375, p. 19 (La.App.4Cir. 8/2/13), 122 So.3d 1028, 1038 ). Under Ramos , it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's "uncomfortable past" must still be "[e]xamined." 590 U.S., at ----, n. 44, 140 S.Ct., at 1401, n. 44 (opinion of the Court). And here, it is not so clear that the animus was scrubbed.
Delegates at Montana's constitutional convention in 1972 acknowledged that the no-aid provision was "a badge of bigotry," with one Catholic delegate recalling "being let out of school in the fourth grade to erase three 'Ks' on the front doors of the Catholic church in Billings."[18] Nevertheless the convention proposed, and the State adopted, a provision with the same material language, prohibiting public aid "for any sectarian purpose or to aid any ... school ... controlled in whole or in part by any church, sect , or denomination." Mont. Const., Art. X, § 6 (1) (1972) (emphasis added). A leading definition of "sect" at the time, as during the Blaine era, was "a dissenting religious body; esp: one that is heretical in the eyes of other members within the same communion ." Webster's Third New International Dictionary 2052 (1971) (emphasis added).
Given the history above, the terms "sect" and "sectarian" are disquieting remnants. And once again, there appears to have been little doubt which schools this provision would predominantly affect. In 1970, according to the National Center for Educational Statistics, Montana had 61 religiously affiliated schools. Forty-five were Roman Catholic.[19] Not only did the convention delegates acknowledge the no-aid provision's original anti-Catholic intent, but the Montana Supreme Court had only ever applied the provision once-to a Catholic school, and one that had "carrie[d] a sizeable portion of the total educational load" in Anaconda, Montana. State ex rel. Chambers v. School Dist. No. 10 of Deer Lodge Cty. , 155 Mont. 422, 430, 472 P.2d 1013, 1017 (1970) (per curiam ). The Montana Catholic Conference also voiced concerns about access to school funds, and a convention delegate proposed removing the no-aid provision's restriction on "indirect"
*2274 aid. See Convention Tr. 2010, 2027. That amendment was rejected.
Thus, the no-aid provision's terms keep it "[t]ethered" to its original "bias," and it is not clear at all that the State "actually confront[ed]" the provision's "tawdry past in reenacting it." Ramos , 590 U.S., at ----, 140 S.Ct., at 1410 (SOTOMAYOR, J., concurring in part). After all, whereas the no-aid provision had originally been foisted on Montana, the State readopted it voluntarily-"sectarian" references included. Whether or not the State did so for any reason that could be called legitimate, the convention delegates recognized that the provision would "continue to mean and do whatever it does now," Convention Tr. 2014 (statement of Delegate Loendorf), and the discrimination in this case shows that the provision continues to have its originally intended effect. And even if Montana had done more to address its no-aid provision's past, that would of course do nothing to resolve the bias inherent in the Blaine Amendments among the 17 States, by respondents' count, that have not readopted or amended them since around the turn of the 20th century.[20]
Today's public schools are quite different from those envisioned by Horace Mann, but many parents of many different faiths still believe that their local schools inculcate a worldview that is antithetical to what they teach at home. Many have turned to religious schools, at considerable expense, or have undertaken the burden of homeschooling. The tax-credit program adopted by the Montana Legislature but overturned by the Montana Supreme Court provided necessary aid for parents who pay taxes to support the public schools but who disagree with the teaching there. The program helped parents of modest means do what more affluent parents can do: send their children to a school of their choice. The argument that the decision below treats everyone the same is reminiscent of Anatole France's sardonic remark that " '[t]he law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread.' " J. Cournos, A Modern Plutarch 35 (1928).

Petitioners' as-applied challenge fails under Trinity Lutheran for the reasons stated above: The Montana Supreme Court's remedy does not put petitioners to any "choice" at all. Rather, petitioners are free to send their children to any secondary school they wish while practicing their religious beliefs, and no one receives a tax credit for their school choice.

Locke confirms that a facial challenge to no-aid provisions must fail. But cf. ante , at 2257 - 2258 (majority opinion). In Locke , this Court upheld the application of a materially similar no-aid provision in Washington State, concluding that the Free Exercise Clause permitted Washington to forbid state-scholarship funds for students pursuing devotional theology degrees. 540 U.S. at 721, 124 S.Ct. 1307.

P. Hamburger, Separation of Church and State 206 (2002).

See Natelson, Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning, 19 Federalist Soc. Rev. 98, 104 (2018).

Green, The Blaine Amendment Reconsidered, 36 Am. J. Legal Hist. 38, 54 (1992) (quoting article; internal quotation marks omitted).

DeForrest, An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns, 26 Harv. J. L. & Pub. Pol'y 551, 566, 570 (2003) ; see also, e.g. , Becket Fund Brief 5-11.

Viteritti, Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law, 21 Harv. J. L. & Pub. Pol'y 657, 667 (1998) (Viteritti, Blaine's Wake).

Jeffries & Ryan, A Political History of the Establishment Clause, 100 Mich. L. Rev. 279, 298 (2001) (Jeffries & Ryan); see also, e.g. , CER Brief 23-26.

See Glenn 166; Lain, God, Civic Virtue, and the American Way: Reconstructing Engel , 67 Stan. L. Rev. 479, 487-488 (2015).

See Jeffries & Ryan 300.

See Viteritti, Choosing Equality: School Choice, the Constitution, and Civil Society 151 (1999).

See Sekulow & Tedesco, The Story Behind Vidal v. Girard 's Executors: Joseph Story, the Philadelphia Bible Riots, and Religious Liberty, 32 Pepperdine L. Rev. 605, 630 (2005).

See id. , at 633-638.

Brief for Union of Orthodox Jewish Congregations of America as Amicus Curiae in Trinity Lutheran Church of Columbia, Inc. v. Comer , O.T. 2016, No. 15577, p. 15 (internal quotation marks, citation, and brackets omitted).

See generally Myers, Know Nothing and Ku Klux Klan, 219 North American Rev. 1 (Jan. 1924).

6 Montana Constitutional Convention 1971-1972, Proceedings and Transcript, p. 2012 (Mont. Legislature and Legislative Council) (Convention Tr.) (statement of Delegate Schiltz); see also, e.g. , id., at 2010 (statement of Delegate Harbaugh) (recognizing the provision as a Blaine Amendment, which "espoused the purpose of the Know-nothing Party"); id. , at 2011 (statement of Delegate Toole) (recognizing the provision as a Blaine Amendment); id. , at 2013 (statement of Chairman Graybill) (same); id. , at 2027 (statement of Delegate Campbell) (same); id. , at 2030 (statement of Delegate Champoux) (same).

See Nat. Center for Educational Statistics, Statistics of Nonpublic Elementary and Secondary Schools 1970-71, pp. 32-33 (1973) (Table 1).

Ala. Const., Art. XIV, § 263 (1901) ; Ariz. Const., Art. II, § 12, Art. IX, § 10 (1912); Colo. Const., Art. V, § 34, Art. IX, § 7 (1876); Del. Const., Art. X, § 3 (1897) ; Ind. Const., Art. I, § 6 (1851) ; Ky. Const. § 189 (1891) ; Miss. Const., Art. 8, § 208 (1890) ; Nev. Const., Art. XI, § 10 (1880); N. H. Const., Pt. II, Art. 83 (1877); N. M. Const., Art. XII, § 3 (1911); N. D. Const., Art. VIII, § 152 (1889); Ohio Const., Art. VI, § 2 (1851) ; Okla. Const., Art. II, § 5 (1907); Ore. Const., Art. I, § 5 (1857); S. D. Const., Art. VIII, § 16 (1889); Wis. Const., Art. I, § 18, Art. X, § 3 (1848); Wyo. Const., Art. I, § 19, Art. VII, § 8 (1889).