ROLAND L. BELSOME, Judge.
| STATEMENT of the case
On October 10, 2002, Billy Lewis and his co-defendant, Ronald Anderson,[1] were indicted with one count each of first-degree murder relating to the July 24, 2002, shooting deaths of sixteen-year-old Travis Webb and his eleven-year-old sister Da-veion Jones.[2] Lewis pled not guilty at his *1167 arraignment on October 25, 2002.[3]
According to the minute entries, the cases were severed on May 11, 2005.
On October 1, 2008, Ronald Anderson filed a motion to declare Article I § 17 of the Louisiana Constitution of 1974 and La. C.Cr.P. art. 782(A) unconstitutional, which the trial court denied on April 23, 2009. There is no indication in the record that Lewis ever joined in the motion.
On October 19, 2009, the State amended the charges against Lewis to two counts of second-degree murder, to which he pled not guilty. Following a four day trial, the jury found Lewis guilty as charged on both counts on March 11, 2010.
|2On March 25, 2010, Lewis filed a written motion for mistrial based upon the alleged unconstitutionality of the non-unanimous verdict provisions of Article I § 17 of the Louisiana Constitution of 1974 and La.C.Cr.P. art. 782(A). The trial court denied the motion for mistrial that same day, and sentenced Lewis on each count to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. This appeal followed.

FACTS

Ms. Dominique Jones testified that in July 2002, she lived on Intrepid Street. At that time, she was fifteen years old and knew both the victim, Travis Webb, and the defendant, Billy Lewis.[4] She confirmed that Webb and the defendant also knew one another prior to the shooting, and testified that she and Webb got into an altercation over the defendant coming into the neighborhood. A few days prior to the shooting, Ms. Jones was speaking to the defendant on her home phone when Webb approached her and pushed her down. Ms. Jones testified that she related the incident to the defendant, who said, “[t]hat boy [Webb] should be dealt with.”
A few days later, on July 24, 2002, as the defendant was visiting Ms. Jones, Webb and his friends from the neighborhood began making derogatory comments to the defendant and telling him to leave the area. Webb purportedly then said, in reference to the defendant, “[h]e’s got a gun, let me go and get mine.” Later that evening, Ms. Jones heard gunshots and people yelling that Webb had been shot.[5] Ms. Jones testified that she subsequently spoke to the defendant on the phone and asked him where he was, to which he responded that he was at a club with friends. |sMs. Jones never saw the defendant in possession of a gun, nor did she show the defendant where Webb lived. Under cross-examination, Ms. Jones denied that she had romantic relationships with either Webb or the defendant, and *1168 stated that she did not tell the defendant to harm or threaten Webb.[6]
The State next called Ms. Keota Brown, the girlfriend of Travis Webb and mother of his child. She testified that she learned of the altercation between Dominique Jones and Travis Webb from her cousin, Jacob.[7] One or two days before the shooting, Ms. Brown and Webb were sitting in the garage at her aunt’s house on Adventure Street when the defendant appeared, looking for Webb. Webb walked to the front of the garage as Ms. Brown tried to restrain him.
Ms. Brown further testified that on the day of the shooting, she and Webb were at the Intrepid Street address. Ms. Brown observed Webb and Ezekiel Harris, a friend, having a conversation outside the house, after which time Webb indicated that he was going to go inside and take a shower. Ms. Brown also went inside, where both the radio and television were turned to a loud volume. As Webb finished showering, his niece, Tierra Jones, knocked on the bedroom door to tell Webb that someone was asking for him at the front door. Ms. Brown did not hear the shooting because of the noise from the television and the radio, but opened the J^door after a few minutes to see Tierra holding up her injured hand and walking towards her. Ms. Brown also discovered Webb kneeling by the sofa holding the wound in his abdomen[8] and Daveion Jones lying on the floor.[9] Ms. Brown testified that she did not see the person who did the shooting, and she could not identify[10] *1169 the defendant as the shooter.[11]
Detective Darryl Ribet,[12] the lead investigator in this case, testified that he observed eight large bullet holes in the front screen door and determined that the shots were fired from outside into the house. Canvassing the scene, he also found three .40 caliber shell casings in the driveway.[13]
During his investigation, Det. Ribet interviewed Ezekiel Harris,[14] a witness who described himself as Travis Webb’s best friend. Harris informed Det. Ribet that he drove Webb and Tierra to the hospital and then returned to the scene. Det. Ri-bet testified that he also spoke to Keota Brown, Webb’s girlfriend, who advised him that there were bad feelings between Webb and Dominique Jones, and that Ms. Jones told Webb that she was going to get her boyfriend, the defendant, after Webb.
ItiOn the morning of July 25, 2002, Det. Ribet obtained an arrest warrant for the defendant, who was ultimately arrested on August 1, 2002, in the 500 block of Rendon Street. The defendant advised Det. Ribet that he should be looking for an individual he referred to as “Running Wild”[15] as well as an individual named Darryl Sutton, and indicated that he was in Darryl Sutton’s green Mustang on the night of the shooting.[16] Det. Ribet’s investigation of the defendant failed to yield any weapons.[17]
Ms. Tierra Jones also testified that on the night in question, she answered the door to find a man with a gun wearing a hat and a bandana over his face asking to see Webb. As Webb walked to the front door, gunfire erupted. Tierra confirmed that she identified Ronald “Running Wild” Anderson as the shooter from a photo lineup a few weeks later.
*1170 Sergeant Kevin Seuzeneau testified that shortly after the shooting, he located to Lakeland Hospital to speak with Tierra Jones and Travis Webb. As Sgt. Seuzen-eau approached the hospital’s emergency entrance, he observed a vehicle speeding away from the area, stopped the vehicle and spoke to the driver, who indicated that he had transported the victims to the hospital.[18] The sergeant testified that he returned to the hospital and spoke with Webb, who told him that “Billy, Dominique’s friend” shot him, and that he was able to see the shooter because the door was open.
| (jEzekiel Harris testified that he and Travis Webb were best friends who lived across the street from one another. Mr. Harris testified that he knew Dominique Jones from the neighborhood, and confirmed that Keota Brown was Webb’s girlfriend. Harris was aware of a conflict between Webb and Dominique Jones. On the day of the shooting, Harris testified that he met Webb at 4:30 p.m. at Webb’s aunt’s house, where the pair visited with family and friends for approximately two hours before driving to Webb’s house on Intrepid Street.
Harris testified that he returned to his residence across the street, and as he spoke to his girlfriend on the phone, he heard rapid gunfire erupt across the street at Webb’s house. Harris got down on the floor, looked out his front window and saw that the front door to Webb’s house was open, but did not see anyone or hear any vehicle drive away. Harris testified that he tried to call Webb, but the line was busy, and as he continued to look out of the window, he saw Webb’s mother fall to her knees at the front door. Harris heard crying and Webb calling to him, “[Da-veion]’s dying, we need to go to the hospital. Please rush us to the hospital.” Harris ran across the street and discovered that both Webb and Daveion were critically wounded. Harris and his mother drove Webb and Tierra to Lakeland Hospital.[19] Harris testified that during the ride to the hospital, Webb told him: “Man, that dude Billy [Lewis] shot me.”[20]
The defendant, Billy Lewis, took the stand and explained to the jury that he met Dominique Jones in February 2002, who suggested that he allow her to braid his hair. He denied a romantic relationship with Ms. Jones. Furthermore, Lewis 17testified that he did not frequent her neighborhood, and that he did not know Webb or anyone else in that neighborhood. The defendant insisted that he had no knowledge of any neighborhood dispute or any trouble between Webb and Ms. Jones, nor was he asked to intervene in any disagreement between the two.
Lewis further testified that on the day of the shooting, he was registered at the Capri Motel where he entertained two female friends[21] at various times during the *1171 day. That evening, he drove to Ms. Jones’ house on Intrepid Street and visited for about five minutes. At about 9:00 p.m., he met with another female friend. Lewis further testified that at approximately midnight, he was with his friend Darryl Sutton playing pool when Ms. Jones called him. Lewis testified that he had no connection to Ronald “Running Wild” Anderson.[22]

ERRORS PATENT

A review for errors patent on the record reveals none.

ASSIGNMENT OF ERROR NUMBER 1

In his first assignment of error, the defendant complains that Article I, § 17 of the Louisiana Constitution[23] violates the equal protection clause of the Fourteenth Amendment.
| ^Louisiana Constitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La. C.Cr.P. art. 782(A) provides in part that “[cjases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” Defendant was charged with two counts of second degree murder, which is punishable by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:31. A jury of twelve was empaneled in this case and rendered verdicts of ten to two and eleven to one in favor of conviction. Accordingly, the proper number of jurors concurred in the verdicts.
Nevertheless, this issue is not preserved for appellate review because the defendant failed to raise an objection as to the unconstitutionality of the complained-of provision. La.C.Cr.P. art. 841(A) provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.” This prohibition extends to errors or deficiencies for which a defendant seeks a mistrial. See State v. Eugene, 03-1128 (La.App. 5 Cir. 1/27/04), 866 So.2d 985, 991.
This particular issue has not been addressed by any court. Notably, however, the Louisiana Supreme Court has found that errors concerning jury matters must be complained of prior to the verdict. See State v. Haarala, 398 |flSo.2d 1093, 1098 *1172 (La.1981). The defendant argues that he filed a motion to declare Article I § 17 of the Louisiana Constitution and La.C.Cr.P. art. 782(A) unconstitutional prior to trial, and also argues that, following the verdict, he reinforced his previous objection by moving for a mistrial based on the same grounds.
However, a review of the record indicates that the defendant did not file any pre-verdict motion to declare Louisiana’s non-unanimous jury verdict provisions unconstitutional. While the record does contain such a motion, it was filed by the defendant’s co-defendant, Ronald Anderson, and there is no notice or other indication in the record that the defendant intended to join in that motion. As previously noted herein, the defendants’ cases had actually been severed at the time Anderson’s motion was filed. Furthermore, the defendant’s motion for mistrial—filed thirteen days after the verdict was rendered—was the improper vehicle for raising the non-unanimous verdict claim. See State v. Bailey, 97-302 (La.App. 5 Cir. 4/28/98), 713 So.2d 588, 609 n. 4. Even if the motion for mistrial were construed as a motion for new trial, the defendant failed to preserve the issue for review, as issues concerning the jury cannot be raised for the first time in a motion for new trial absent a pre-verdict objection. See State v. Collins, 359 So.2d 174, 177 (La.1978). Accordingly, because the defendant failed to lodge any pre-verdict objection to the constitutionality of the complained-of provisions, the post-verdict motion for mistrial notwithstanding, he is precluded from assigning such as error on appeal; this assignment of error has been waived.

ASSIGNMENT OF ERROR NUMBER 2

1 ipThe defendant next argues that the non-unanimous jury verdicts violate his right to a jury trial under the Sixth and Fourteenth Amendments; however, the Louisiana Supreme Court has previously rejected the defendant’s argument. As the Court stated in State v. Bertrand, 2008-2215, p. 6 (La.3/17/09), 6 So.3d 738, 742, under current jurisprudence from the United States Supreme Court, non-unanimous twelve-person jury verdicts are non-violative of the Sixth and Fourteenth Amendments.[24]

ASSIGNMENT OF ERROR NUMBER 3

In the third and final assignment of error, the defendant argues that the trial court erroneously denied him the right to utilize a “reserved” backstrike on a provisionally accepted juror, Rickey Steven Wolfe, following the close of the fourth and final venire panel. The record reflects that the trial judge denied the defendant’s backstrike because Mr. Wolfe had been a member of the first panel, and indicated a belief that the law did not allow back-strikes on a particular panel once the unexcused jurors had been accepted therefrom. The defendant further argues that the court’s error was not harmless because it deprived him of his right to freely exercise a peremptory strike, consistent with Louisiana law.
Backstriking of jurors is authorized by La.C.Cr.P. art. 799.1, which provides:
Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788, in the jury selection process, the state and the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full corn- *1173 plement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the | njury composition or have exercised all challenges available to them, unless otherwise agreed to by the parties.
In this case, after the State and defense exercised their peremptory challenges to the first venire panel, defense counsel asked the court whether Wolfe, a member of that panel, had been selected as a juror or been challenged. The court informed counsel that Wolfe had been chosen as a juror, to which counsel responded, “okay.” After the first panel produced six jurors, the court asked if either party wished to exercise any backstrikes, to which defense counsel responded, “[w]e’d reserve.” After the conclusion of the fourth venire panel, the defendant attempted to exercise his reserved backstrike on Wolfe, and the court denied his request, advising that it only allowed backstrikes on a “per panel” basis and “[didn’t] have to allow [the defendant] to go all the way back to the first panel” to exercise a backstrike.
Considering the plain language Article 799.1, which provides that “prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted,” the trial court erred by refusing to allow the defendant to exercise his reserved backstrike on juror Wolfe. La. C.Cr. P. art. 799.1. In addition to establishing that the court erred in denying his exercise of a backstrike, however, the defendant must also demonstrate that the court’s error unduly prejudiced him.
In State v. Hailey, 2002-1738, p. 4 (La.App. 4 Cir. 9/17/03), 863 So.2d 564, 567, this Court recognized a party’s right to backstrike a juror who had been initially accepted, so long as the juror is peremptory challenged prior to the swearing in of the entire jury panel:
| ^Backstriking is a party’s exercise of a peremptory challenge to strike a prospective juror after initially accepting him. State v. Plaisance, 2000-1858, p. 30, n. 4 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1193, n. 4, writ denied, 2002-1395 (La.11/27/01), 831 So.2d 270, cert, denied, Plaisance v. Louisiana, 538 U.S. 1038, 123 S.Ct. 2084, 155 L.Ed.2d 1071 (2003). An accused has a constitutionally guaranteed right to peremptorily challenge jurors. La. Const. Art. I, § 17. La.C.Cr.P. art. 795(B)(1) states only that peremptory challenges shall be exercised prior to the swearing of the jury panel. La.C.Cr.P. art. 788(A) states that when a prospective juror is accepted by the State and the defendant, he shall be sworn immediately as a juror, subject to the provisions of La. C. Cr. P. art. 795. Thus, in State v. Watts, 579 So.2d 931 (La.1991), the Louisiana Supreme Court cited La.C.Cr.P. art. 795(B)(1) in holding that even though a prospective juror is “temporarily” accepted and immediately sworn as juror in accordance with La.C.Cr.P. art. 788, that juror may nevertheless be challenged peremptorily prior to the swearing of the entire jury panel.
In State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, the Louisiana Supreme Court determined that the denial of a right to exercise a backstrike was subject to a harmless error analysis, finding that although the trial court improperly denied the defendant the right to exercise his remaining peremptory challenges immediately before the jury panel was *1174 sworn, such error was harmless. Likewise, in Plaiscmce, supra, this Court held that La.C.Cr.P. art. 795(B)(1), as interpreted in Watts, supra, provided for backstrikes. This Court further held that the trial court in Plaisance erred in denying the defendant the right to use backstrikes, but found the error harmless, citing Taylor, supra. State v. Hailey, 2002-1738, p. 5, 863 So.2d at 567. Thus, a defendant has a right under La.C.Cr.P. art. 795(B)(1) to employ backstrikes, but the erroneous denial of that right is subject to the harmless error analysis. Id; see also James E. Boren & Michael A. Fiser, Fear of A Paper Tiger: Enforcing Louisiana’s Procedural and Statutory Rules in the Wake of Harmless Error Analysis, 64 La. L.Rev. 5, 11 (2003)(noting that “a defendant has a right under Louisiana Code of Criminal Procedure art. 795(B)(1) to employ back-strikes, |; <¡¿e., exercise remaining peremptory challenges before a jury panel is sworn, but the erroneous denial of that right is subject to harmless error analysis.”).
The defendant in this case argues that the question of harm should turn on whether the trial court’s ruling prevents the defendant from using a peremptory strike. Although “[a]n erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error,” State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, in this case, the defendant was not erroneously deprived of his last peremptory challenge. Nevertheless, the defendant argues that the same logic should apply under these facts, and that any denial of a peremptory challenge should not be susceptible to harmless error analysis. Furthermore, while a defendant has a right under the Louisiana State Constitution to peremptorily strike prospective jurors, there is no constitutional right to back-strike, only a statutory right. See, e.g., State v. Stukes, 2008-1217, p. 19 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1246, writ denied, 2009-2194 (La.4/9/10), 31 So.3d 381; State v. Hailey, 2002-1738, p. 9, 863 So.2d at 569.
In this case, the error involves only a violation of the defendant’s statutory right to backstrike previously-accepted jurors prior to the swearing-in of the final jury. The defendant’s state constitutional right to exercise peremptory challenges was not implicated, considering that the trial court offered him the opportunity to peremptorily strike juror Wolfe at the conclusion of voir dire of the first venire panel. Accordingly, the defendant must demonstrate that the trial court’s erroneous refusal to allow him to subsequently backstrike Wolfe contributed to the jury’s verdicts against him. See State v. Hailey, 2002-1738, p. 9, 863 So.2d at 569.
114Even assuming arguendo that another juror submitted in Wolfe’s place would have returned not guilty verdicts on both counts,[25] the backstriking of Wolfe would still have returned a legal verdict of guilty, resulting in a life sentence. Therefore, the defendant cannot demonstrate that the outcome of his trial would have been materially different had the trial court properly allowed him to backstrike Wolfe.
Furthermore, a review of the voir dire transcript indicates that despite the defendant’s opportunity to examine Wolfe and challenge him for cause, defense counsel engaged Wolfe minimally and did not single Wolfe out for questioning on any subject. Wolfe’s answers and statements during voir dire were neutral or favorable to the defense. Wolfe stated that he worked on a pipeline; that he would listen to country music radio in his vehicle; and *1175 that he had a ten-year-old-son. On a scale of one to ten, Wolfe rated the NOPD only a five. Upon questioning by the defense, Wolfe said that he would have no problem returning a verdict of not guilty despite one of the victims in the case being a child; that he was not familiar with the area in which the crime occurred; that he could fairly consider medical evidence that might contradict the testimony of a State witness; and that he would weigh dying declaration testimony less than other evidence admitted at trial.
Considering Wolfe’s responses in voir dire, it does not appear that he warranted a defense challenge. Wolfe’s mediocre appreciation of the NOPD and his mistrust of dying declaration testimony could have provided grounds for a State challenge for cause. Of the nineteen potential jurors other than Wolfe on the first venire panel, the defendant exercised peremptory challenges against only two, who gave the NOPD ratings of four and six. Seven potential jurors were struck for |,.r,cause between the parties. Of the remaining ten, six gave the NOPD equal or lower ratings than Wolfe, and none was challenged by the defendant. Notably, the jurors’ perception of police formed his sole basis for challenging for cause another juror who had given the NOPD a perfect rating. Moreover, almost every panel member voiced hesitation regarding dying declaration testimony and opined that it would have to be considered based on the strength of the remaining evidence. One juror, who was not struck by the defendant, affirmed that he would treat such evidence with a high degree of skepticism, while another said she would not consider such evidence if it were not written.
We find the record reflects that defense counsel had ample opportunity to examine Wolfe, to challenge him for cause, and to peremptorily challenge him after the first venire panel. The defendant has not demonstrated any specific prejudice that inured to him because of the trial court’s erroneous ruling; notably, Wolfe shared pertinent attributes with other potential jurors whom the defendant did not strike. Moreover, the defendant has failed to show that another juror would have voted to acquit him in Wolfe’s absence. Even giving the defendant the full benefit of the doubt concerning Wolfe, the trial would have still ended in a guilty verdict and life sentence as to one count of the indictment. While it is arguable that the verdict on the other count could have resulted in a nine to three verdict, the defendant has not demonstrated a reasonable probability that this would have occurred.
Additionally, as the defendant acknowledged in his appellate brief, he had three peremptory challenges remaining. In State v. Taylor, supra, the Louisiana Supreme Court specifically recognized that the defendant in that case had five peremptory challenges remaining, and found no merit in the defendant’s argument |,fithat any prejudice resulted from failing to exhaust all his peremptory challenges. The Court held that “[t]he trial court’s refusal to allow the parties to ‘back strike’ prospective jurors did not prevent the defendant from utilizing all of his challenges during the jury selection process.” State v. Taylor, 93-2201, p. 26, 669 So.2d at 378.
Accordingly, the defendant has failed to demonstrate that but for the trial court’s erroneous denial of his backstrike of juror Wolfe, there is a reasonable probability that the outcome of his trial would have been any different, and that the jury’s verdicts were attributable to the error.

CONCLUSION

For the foregoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED
BONIN, J., dissents with reasons.

. Ronald Anderson is not a party to this appeal.

. The shooting occurred at 14327 Intrepid Street in New Orleans, Louisiana.

.On November 19, 2002, the trial court conducted a competency hearing after which Lewis was found competent to stand trial. In May 2003, the trial court conducted hearings on Lewis’ pre-trial motions to suppress evidence, statements and identification. On May 21, 2003, the trial court denied the motions to suppress statements and identification. On July 9, 2003, Lewis filed motions to suppress the dying declaration of Travis Webb and to quash the indictment. The trial court denied the motions on July 18 and 25, 2003, respectively.

. The defendant was twenty-seven years old at the time of the shooting; Ms. Jones testified that the defendant told her when they met initially that he was eighteen years old.

. The body of Travis Webb was autopsied by Dr. Gerald Liuzza on August 22, 2002, at approximately 10:00 a.m. Dr. Liuzza determined that the victim suffered two gunshot wounds from a high velocity weapon. One bullet entered the victim’s right forearm and the second bullet, the mortal wound, pierced his abdomen, incising his liver, colon and small intestines. Webb died approximately one month after the shooting.

. Due to time constraints, the defense agreed to call Dominique Jones back to the stand as its first witness. Defense counsel referred Ms. Jones to her prior testimony given on May 14, 2003, at which time Ms. Jones said that she saw the defendant at her house on July 24, 2002, for about ten minutes, approximately six hours prior to the homicide, and she did not know where the defendant went after that time. Under cross-examination, Ms. Jones explained that she saw the defendant twice on the day of the homicide, once in the morning and once between 9:00 and 10:00 p.m. that evening.

. Jeremiah Brown, Keota Brown's brother, also testified, stating that he lived on Painters Street at the time of the shooting, but that he spent time at his Aunt Debra's house in Mi-choud, Louisiana. Mr. Brown acknowledged that his sister and Webb were dating, but testified that he knew nothing of the shooting, and he said that he did not remember giving a statement to the police. At the request of the State, the court declared Brown a hostile witness; Mr. Brown continued to give non-responsive answers to the prosecutor's questions. Consequently, the prosecutor presented Mr. Brown with a statement he purportedly gave to police, in which he indicated that before the shooting, there was an altercation between Webb and Ms. Jones, at which time Webb pushed Ms. Jones. Mr. Brown also indicated that Ms. Jones cursed Webb and told him to be around her house on the day of the shooting because she "had something for him.” Mr. Brown reported that just prior to the shooting, he observed the defendant drive to the Intrepid Street address and get out of his car with a gun.

. Assistant NOPD Communication Supervisor, Cindy Woods, testified that her job entailed supervising 911 operators and calls. As the custodian of all 911 calls, Ms. Woods identified the printout copy of the incident recall related to the July 24, 2002, shooting at 14327 Intrepid Street bearing item number G-45223-02. The State played the recording of the 911 call made by Emily Harris, who lived across the street from the scene of the shooting.

. Dr. William P. Newman, III autopsied the body of Daveion Jones on July 25, 2002, at approximately 7:45 a.m. Dr. Newman testified that the victim suffered a frontal gunshot to her head which caused extensive destruction of the skull and brain. Dr. Newman did not recover a bullet from the victim’s skull. Further, he stated that the victim died almost instantly because of the catastrophic injury to her head.

. Ms. Terry Varnado, Travis Webb's mother, also testified that she was at the Intrepid *1169 Street address on the night of the shooting, and although she saw two men running away from the house, she could not identify either of them.

. The shooting scene was investigated by NOPD Crime Scene Technician Tarez Smith Cook. Ms. Cook identified State’s Exhibit 5, item number G-45223 of 2002 as the crime scene report of her investigation of this homicide, and also identified photographs she had taken of the interior and exterior of the house where the shooting occurred, testifying that she saw Daveion Jones lying in the hallway near the front door with a bullet casing near her right knee. Ms. Cook collected several other .40 caliber bullet casings from the residence as well as one pair of pants located in the front yard of the residence.

. Det. Ribet is now retired.

. Det. Ribet also testified that he obtained a pellet recovered during surgery on Tierra Jones. The pellet was consistent with an assault rifle.

. Emily Harris, who made the 911 call played for the jury, is Ezekiel Harris’ mother.

.- Det. Ribet subsequently determined that "Running Wild” was the nickname of Ronald Anderson.

. Det. Ribet testified that based upon this information, he had Darryl Sutton picked up and taken to the station for questioning; however, Sutton refused to give a statement.

. Now retired NOPD ballistics expert, Kenneth Leary, examined three bullet casings, four bullets and one fragmented bullet recovered from the Intrepid Street shooting scene. After examining the .40 caliber cartridge cases, he determined that the bullets were fired from the same weapon. He performed the same inspection on the bullets and determined that they were all fired from the same AK47 or SKS assault rifle. Moreover, Leary examined four weapons relative to this case, which were seized from different locations. His testing was inconclusive on all of the weapons as to whether any of them fired the bullets and casings seized at the scene. At a later date, Leary was asked to examine a copper jacketed bullet recovered from the body of Daveion Jones. However, as with the other bullets and casings, testing was inconclusive to connect the copper bullet to any of the weapons seized.

. The driver was Ezekiel Harris.

. Daveion died at the scene.

. After medical personnel began working on Webb, Harris testified that he drove back to Webb’s house to check on Daveion, at which time Harris told police officers what he knew of the incident and gave a recorded statement to detectives later that evening, relating what Webb had told him. Additionally, Officer Jason Sloan testified that he assisted in the investigation of this shooting by relocating to Lakeland Hospital where he interviewed Webb, who advised him that “Billy” shot him and that he saw Billy through the open front door.

.Ms. Tynette Gaunichaux testified that she met the defendant at the Capri Motel on July 24, 2002, and that they engaged in sex for about two hours until the defendant left to return his friend’s vehicle. Ms. Gaunichaux testified that she could not remember what time of day that she was in the hotel with the defendant.
*1171 Ms. Iilyn Jackson also testified that she had a sexual relationship with the defendant, and remembered being with the defendant at the Capri Motel but could not recall the day.

. The defendant concedes that this issue is foreclosed by Bertrand and raises it solely to preserve it for further review in the U.S. Supreme Court.

. The following morning at work, Lewis learned that he was a suspect in the shooting. After being booked, Lewis testified that he learned the name of the person responsible for the shooting during conversations while he was incarcerated, at which time he wrote a letter to his sister, Patrice Lewis, asking her to send the information anonymously to Cri-mestoppers.

. Article 1 § 17 provides in part:
(A) Jury Trial in Criminal Cases. A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict. A case in which the punishment may be confinement at hard labor or confinement without hard labor for more than six months shall be tried before a jury of six persons, all of whom must concur to render a verdict. The accused shall have a right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law. Except in capital cases, a defendant may knowingly and intelligently waive his right to a trial by jury but no later than forty-five days prior to the trial date and the waiver shall be irrevocable.

. The vote on the second count was 11-1.