Judge Rosemary Ledet
| T This is a criminal appeal. The defendant, Billy Lewis, appeals his two con *205 victions for second degree murder, in violation of La. R.S. 14:30.1,. and two life sentences. For the reasons that follow, we affirm.
STATEMENT OF THE CASE
On October 10, 2002, the defendant, Mr. Lewis, and a co-defendant, Ronald Anderson, were charged by grand jury indictment with two counts of first degree murder, in violation of La. R.S. 14:3o.[1] The charges stemmed from the July 24, 2002 shooting deaths of sixteen-year-old Travis Webb (“Travis”) and his eleven-year-old niece, Daveion Jones (“Daveion”). On October 25, 2002, Mr. Lewis pled not guilty at his arraignment. On October 19, 2009, the State amended the charges against Mr. Lewis to two counts of second-degree murder. Mr. Lewis pled not guilty to those charges.
Following a four-day trial, the jury found Mr. Lewis guilty as charged on both counts; the district court sentenced him to life imprisonment. Although this [ 2court affirmed the convictions, the Louisiana Supreme Court reversed based on the denial of back strikes during voir dire. State v. Lewis, 10-1775 (La.App. 4 Cir. 4/4/12), 96 So.3d 1165, writ granted, 12-1021 (La. 12/14/12), 104 So.3d 425, rev’d, 12-1021 (La. 3/19/13), 112 So.3d 796, reh’g denied (5/3/13). The Supreme Court remanded the matter for a new trial.
On September 14, 2015, Mr. Lewis’ new trial commenced; it concluded three days later. The jury found him guilty on both counts of second degree murder. On October 2, 2015, Mr. Lewis filed motions for arrest of judgment, downward departure of sentence, and new trial. On October 19, 2015, the district court denied all three motions. On October 23, 2015, the district court sentenced Mr. Lewis to two concurrent life sentences without benefit of probation, parole, or suspension of sentence, with credit for time served. This appeal followed.
STATEMENT OF THE FACTS
Two days before the shootings, one of the homicide victims, Travis, had a physical altercation with Mr. Lewis’ sixteen-year-old friend, Dominique Jones (“Dominique”), during which he pushed her. Dominique lived in the same neighborhood as Travis. Ezekial Harris (“Ezekial”), Travis’ best friend and neighbor for five years before his death, testified that on the day after the physical altercation, Mr. Lewis rode around their neighborhood looking for Travis. The following day, Travis was shot.
On the day of the shooting, Ezekial and Travis worked together at an amusement park in New Orleans East; and they arranged to get together after work. On that night, Ezekial, Travis, and Travis’ girlfriend, Kieotha Brown |s(“Kieotha”), visited with friends. At about 11:00 p.m., they drove to Travis’ house and sat in the driveway conversing for about twenty minutes. Then, Travis went inside his house; and Ezekial walked across the street to his house. Five minutes later, Ezekial heard multiple gunshots. When the firing stopped, Ezekial looked out his kitchen window. He saw that the front door of Travis’ house was open and that Travis’ mother, Terry Varnado, was sitting outside crying.
Ms. Varnado testified that on the night of the shooting she was at her house on Intrepid Street in New Orleans, Louisiana. Six other people were at her house that night — her four grandchildren, which included Tierra Jones (“Tierra”) and Da-vieon; her son, Travis; and his girlfriend, *206 Kieotha. At about 11:00 p.m., Ms. Varnado and her grandchildren were exercising in the back of the house when someone rang the front doorbell. At that time, Travis was taking a bath. Tierra, followed by her sister Davieon, went to answer the front door. A wrought iron screen door protected the wooden front door. When Tierra opened the wooden door, a man armed with a black gun and wearing a black hat and a bandanna around his mouth and over his ears stood on the front step. Tier-ra explained that she was not afraid because she thought the man was one of Travis’ friends playing with a BB gun. The man asked to speak with her Uncle Travis. Tierra closed the wooden door, leaving at best a crack in it; she apparently never opened the protective screen door. Tierra then went to summon Travis.
As Travis walked down the hall to the door, Tierra waited in the living room, standing by a mirror that faced the front door. Ms. Varnado walked behind Travis to the door. Before Travis reached the front door, Tierra heard gunshots.[2] |4The gunfire blew open the front door. Ms. Varnado saw Tierra, Davieon, and Travis fall to the floor. When the shooting stopped, Ms. Var-nado ran to the front window and observed two unidentified men running from the front of her house with something in their hands. About that same time, Travis yelled, “She’s dying, get us to the hospital.”
At this point, Ezekial had come to the house. Ezekial placed Travis, who was shot in the stomach, and Tierra, whose hand was maimed by gunshots, in his sister’s car. Ezekial then returned inside the house to check on the other occupants. Davieon, who sustained a massive, fatal wound to her head, was dead in Ms. Varnado’s arms. Ms. Varnado called 911.[3] As Ezekial drove Tierra and Travis to the nearest hospital, which was Lakeland Hospital, Travis told Ezekial that “Billy” and another man had shot him.
Detective Darryl Ribet, the lead detective, described the crime scene as a single family home lit by a porch light. When he arrived at the scene, both the screen door and the wooden front door were open, and each was riddled with bullet holes. Just inside the threshold, a young, deceased female was lying in a pool of blood caused by a massive injury to her head. Detective Ribet testified that the gunmen shot into the house from the outside. The ballistics evidence, which was lost in the aftermath of Hurricane Katrina, indicated that both a small caliber weapon and an assault rifle were used in the shootings. Detective Ri-bet directed Sergeant Kevin Seuzeneau to check on the status of the two surviving victims who |fiwere transported .to the hospital and to gather information from those victims. Detective Ribet later learned that Officer Jason Sloan performed the same function as Sergeant Seuzeneau.
When Sergeant Seuzeneau arrived at the hospital, he spotted Ezekial speeding away. Sergeant Seuzeneau stopped Ezekial, who had blood on his shirt. Ezekial told Sergeant Seuzeneau that he was on his way back to the crime scene. Sergeant Seuzeneau accompanied Ezekial there to ensure Ezekial made contact with the in *207 vestigating officers. After he assessed the crime scene, Sergeant Seuzeneau relocated to the hospital to speak with the surviving victims. Although he was unable to speak with Tierra, Sergeant Seuzeneau spoke to Travis, who was on a stretcher in the emergency room. Sergeant Seuzeneau testified that Travis told him that “Billy,” Dominique’s friend, shot him. Travis was certain it was “Billy” who shot him because he saw “Billy” through the door. Travis, however, did not know Billy’s last name. A few moments later, Officer Sloan arrived at the emergency room.
Officer Sloan testified that Travis, who was conscious and lucid, told him that he knew that “Billy” was one of the shooters. He further testified that Travis explained he knew it was “Billy” because he saw “Billy” when he answered the door. Sergeant Seuzeneau also heard Travis tell Officer Sloan that it was “Billy” who shot him. Both Sergeant Seuzeneau and Officer Sloan relayed the information they received from Travis to the lead detective, Detective Ribet.
On the night of the shooting, New Orleans Police Department (“NOPD”) officers canvassed the neighborhood, locating a number of witnesses. Detective Ribet’s report reflects that a total of seven witnesses were interviewed immediately after the shooting, including Ezekial, Dominique, and Kieotha. Detective Ribet ran 16Mr. Lewis’ name through the computer and placed his photograph in a line-up for identification purposes. Although the witnesses who were interviewed identified Mr. Lewis’ picture, none of them was an eyewitness to the shooting.
Detective Ribet spoke with Ezekial before leaving the scene that night. Ezekial referred him to Dominique. Ezekial explained that he recognized Mr. Lewis from the neighborhood as Dominique’s boyfriend. He further explained that Dominique lived in their neighborhood — two blocks away from his house and Travis’ house. A few days after the shooting, Ez-ekial viewed a photograph lineup and identified “Billy” from seeing him in the neighborhood, while “Billy” had his hair braided by Dominique. Dominique informed the police that she met Mr. Lewis, who was twenty-seven years old,. at Wal-Mart. When Ezekial learned that the police were searching for a Green Mustang with black stripes, he provided the police with Mr. Sutton’s name as the owner of a vehicle fitting that description.[4]
On the day after the shooting, Detective Ribet spoke with Mr. Sutton, who admitted that he owned a green Mustang in 2002 and that he loaned it to Mr. Lewis on the night of the shooting. Mr. Sutton testified at trial that he worked with Mr. Lewis at an amusement park in New Orleans East. He acknowledged that he loaned his green Mustang to the Mr. Lewis on July 24, 2002, at approximately 7:00 p.m., and that Mr. Lewis returned the vehicle around 11:00 p.m. that night.
Stacy Jenkins (“Stacy”) testified that she knew Mr. Lewis and that in 2002 he dated her sister, Lawanda Jenkins (“Lawanda”). Stacy explained that Mr. Lewis and her sister, Lawanda, had two children together. In 2002, she would see Lawanda at her house on a daily basis; Mr. Lewis usually was present unless he |7was working. Stacy further explained that, in 2002, she was dating Mr. Sutton, who at that time owned a green Mustang. Stacy saw Mr. Sutton on the day of the shooting between 5:00 p.m. and 6:00 p.m., riding his *208 motorbike. She also saw Mr. Lewis that evening driving Mr. Sutton’s green Mustang. When she saw him, Mr. Lewis was talking to Mr. Anderson on the corner of Rocheblave and Columbus Street. Stacy-observed Mr. Anderson get into the green Mustang with Mr. Lewis and then drive away with him. ■
Based on the information the officers obtained, Detective Ribet prepared a warrant for Mr. Lewis’ arrest. The police located Mr. Lewis with the assistance of his cell phone records and the FBI. After the shooting, Detective Ribet made several unsuccessful attempts to interview Travis and Tierra. Travis was on a ventilator and died a month after the shooting without ever leaving the hospital; his death was classified a homicide.[5] Tierra recovered from her injuries. A' month after the shooting, when her condition had improved, Tierra viewed a photograph lineup that Detective Ribet displayed to her, which contained Mr. Anderson’s photograph. Mr. Anderson had been developed as a suspect in this case based on a Cri-meStoppers’ tip. Tierra identified Mr. Anderson as one of the shooters.
Detective Ribet secured a warrant for Mr. Anderson’s arrest at his last known address on Duplessis Street. At that location, Detective Ribet made contact |swith Tamara Anderson, Mr. Anderson’s wife, who signed a consent to search the premises. From that location, Detective Ribet seized assault rifle ammunition. Subsequently, Ms. Anderson directed Detective Ribet to 3704 Gibson Street where she obtained an AK-47 rifle and turned it over to Detective Ribet. Other than Mr. Lewis and Mr. Anderson, no other suspects were developed in the murders of Travis and Davieon.
NOPD firearms examiner Kenneth Leary testified by stipulation as an expert in the fields of firearms examination and identification. Mr. Leary testified that three fired .40 caliber cartridge cases and two fired 7.62 mm jacketed lead bullets were recovered from the crime scene. The three .40 caliber cartridge cases were fired from the same weapon. Likewise, the 7.62 mm ammunition, which is used in a semiautomatic assault rifle known as an AK-47, was fired from the same rifle. Mr. Leary could not say with certainty that the AK-47 rifle that he tested in connection with this case was the weapon fired in the shootings. Mr. Leary tested another bullet, which was recovered from Lakeland Hospital. This bullet was similar to the AK-47 ammunition recovered from the crime scene, but this bullet did not exhibit sufficient striation to positively link it to the AK-47 rifle connected to this case.
Deputy Anthony Bruscato of the Plaque-mines Parish Sheriff’s Office executed a search warrant on Mr. Lewis’ residence in St. Bernard Parish in 2002. Incident to the warrant, Deputy Bruscato seized a letter *209 from a bed in the | residence.[6] Deputy Bruscato opined that the letter revealed the identity of the killer in this case and thus he contacted the NOPD.
DISCUSSION[7]

Assignment of Error Number One

Mr. Lewis’ first assignment is that “[a]s one Judge on this Court has already found, all statutory delays for commencing trial had expired when Mr. Lewis filed- his motion to quash. The motion should have been granted.” Mr. Lewis’ reference is .to Judge Bonin’s dissent from this court’s denial of his writ application, which sought review of the same issue. Particularly, Mr. Lewis cites the following language from Judge Bonin’s dissent:
This period of suspension, unlike a period of interruption, which does not commence anew until the cause of the interruption disappears, only lasts “until the trial court rules on the filing of the preliminary plea.” State v. Rome, 630 So.2d 1284, 1287 (La. 1994). The period from the filing of the motion until the ruling is the relevant period of suspension, and “[t]he relevant period is simply not counted; and the running of the time resumes when the motions are ruled on.” Id. ... Notably, the other one-year period, that is the one-year minimum-guaranteed period which follows a ruling on the preliminary plea is not, strictly speaking, a period of suspension. It serves as additional protection to allow the prosecution the opportunity to prepare for trial. Because the trial judge ruled on the defendant’s preliminary plea on November 7, 2013, the state-had until Monday, November 9, 2014 to commence the trial of Mr. Lewis.
In finding that the period of suspension is continuing despite her ruling granting the motion, the trial judge misapplied the law, and her ruling on the motion to quasb is not entitled to our deference.
I mBoth this court and the Louisiana Supreme Court-denied Mr. Léwis’ writ application seeking review of the district court’s ruling denying his motion to quash. Under the law of the case doctrine, appellate courts generally decline to reconsider their own rulings of law on a subsequent appeal in the same case. State v. Duncan, 11-0563, p. 26 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 520 (citing Pitre v. Louisiana Tech University, 95-1466, p. 7 (La. 5/10/96), 673 So.2d 585, 589). The law of the case doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not only those arising from an appeal. Duncan, supra (citing State v. Molineux, 11-0275, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 617, 619).
Applying the law of the case doctrine, an appellate court will not reverse its pretrial- decision unless the defendant presents new evidence tending to show that the pretrial decision was patently erroneous and produced an unjust result. Duncan, supra (citing State v. Gillet, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728). Although a different deci *210 sion on appeal is not absolutely precluded, judicial efficiency demands that great deference be accorded to the earlier decision. Id.
Here, Mr. Lewis failed to present any new evidence bearing on the correctness of this court’s prior decision denying his pretrial writ application seeking review of the district court’s denial of his motion to quash. State v. Lewis, 15-0021, (La. App. 4 Cir. 3/5/15) (unpub.).[8] Thus, Mr. Lewis has failed to show that this court should not follow the law of the case doctrine and decline to exercise its discretion to reconsider its prior ruling on this issue.
^Regardless, turning to the merits of the motion to quash, we reach the same result. A trial court’s ruling on a motion to quash is discretionary and should not be disturbed by an appellate court absent a clear abuse of discretion. State v. Love, 00-3347, pp. 9-10 (La. 5/23/03), 847 So.2d 1198, 1206 (“[b]ecause the complementary role of trial courts and appellate courts demands that deference be given to a trial court’s discretionary decision, an appellate court is allowed to reverse a trial court judgment on a motion to quash only if that finding represents an abuse of the trial court’s discretion.”). See also State v. Sorden, 09-1416, p. 3 (La. App. 4 Cir. 8/4/10), 45 So.3d 181, 183; State v. Kitchens, 09-0834, 09-0836, p. 4 (La.App. 4 Cir. 3/24/10), 35 So.3d 404, 406; State v. Ramirez, 07-0652, p. 4 (La.App. 4 Cir. 1/9/08), 976 So.2d 204, 207. As the Supreme Court explained in Love, “[w]hen a trial judge exercises his discretion to deny a motion to quash, he presumably acts appropriately, based on his appreciation of the statutory and procedural rules giving him the right to run his court.” 00-3347 at p. 12, 847 So.2d at 1208.
Mr. Lewis’ position is that the Motion for Access and Inspection of Evidence he filed was not a preliminary plea as contemplated by La. C.Cr.P. art. 580(A), as it would not have delayed trial thereby triggering suspension of the running of the one-year time limit for retrial. In the alternative, he contends that even if the motion was a preliminary plea, which did suspend the one-year period within which the state had to bring him to trial, that period of suspension ended on November 7, 2013, when the trial court ruled upon the Motion for Access and Inspection of Evidence. He thus contends that more than one year elapsed between the district court’s ruling on that motion and November 17, 2014 — the date on | iawhich he filed the motion to quash. It follows, he contends, that the district court erred in denying his motion to quash.
The State counters that the Motion to Access and Inspect the Evidence was a preliminary plea, which suspended the time period to commence trial. Moreover, the State argues that as defense counsel had not yet viewed the evidence by the time the motion to quash was filed, defense counsel was not ready for trial at that time and would not be ready until the evidence was viewed. Agreeing with the State, the district court denied the motion to quash.
This court cannot conclude that the district court abused its discretion in denying Mr. Lewis’ motion to quash. Mr. Lewis’ Motion to Access and Inspect the Evidence was a preliminary pleading for purposes of suspending the time to bring him to trial under La. C.Cr.P. arts. 580 and 582. Although the district court granted Mr. Lewis’ Motion to Access and Inspect the Evidence shortly after it was filed in *211 November 2014, the district court, sua sponte, noted the defense’s discovery request was still outstanding the week before the case was set for trial. As the district court explained in denying the motion to quash:
Although this Court granted the defense motion, thereby ruling on the motion, this Court is of the opinion that the defense counsel’s motion is still outstanding, even until this very day.
At a bench conference the week prior to this case being set for trial, defense counsel noted to this Court that he had not yet accessed evidence in the matter, as there were issues with the evidence being located. On the record yesterday, defense counsel still could not state whether he had actually accessed and inspected the evidence in preparation for trial in accordance with the Court’s ruling.
Since this Court had been made aware of the fact that there were issues surrounding the location of the evidence in this matter, the Court believed that the discovery had not been fully satisfied, as counsel had not even accessed the evidence.
|1sIt is this Court’s ruling that the time limitations have been suspended and therefore the State of Louisiana is not out of time to bring this matter to trial and therefore defense counsel’s Motion to Quash the Indictment is hereby denied.
Addressing a similar issue, the court in State v. Catalon, 14-768, p. 5 (La.App. 3 Cir. 12/23/14), 158 So.3d 114, 117-18, writ denied, 15-0462 (La. 1/8/16), 184 So.3d 692, remanded for an evidentiary hearing on the motion to quash. In so doing, the court noted:
Within this period, the trial court continued the case on its own to allow the defense time to changeover to newly-appointed counsel. At this hearing, former counsel for the defense appeared and informed the court that he would be turning over his entire discovery packet to Defendant’s new counsel the next week. The court responded by resetting the matter and issuing a new discovery order. Under similar circumstances, the supreme court has found such court action to suspend the prescriptive period. In [State v. Brooks, 02-0792 (La. 2/14/03), 838 So.2d 778, the supreme court found that the trial court’s own continuance, for the purpose of allowing a defendant time to substitute counsel, constituted a preliminary plea within the scope óf La.Code Crim.P. art. 580. The court reasoned that the trial court’s continuance, made solely to accommodate the defense and effectuate the defendant’s right to counsel, suspended prescription because the State’s ability to prosecute was affected until the matter of the defendant’s representation was settled. Id. As in Brooks, the trial court here continued the case to accommodate the defense. Similarly to Brooks, the State’s ability to prosecute was affected until Defendant’s new counsel had the opportunity to receive discovery material from former defense counsel and file any necessary motions. Accordingly, the trial court’s continuance on June 1, 2012, suspended the time period for commencing trial. The State had until June 1, 2013 to commence trial.
Id. The jurisprudence thus recognizes that, under certain circumstances, a trial court’s sua sponte action taken to benefit a defendant may result in a suspension of the statutory time limit to bring a defendant to trial. Such is the case here.
The district court, sua sponte, recognized that the defense’s discovery request had not been satisfied. Despite that the district court formally ruled on the discov *212 ery motion shortly after it was filed, the district court properly concluded luthat discovery had not been satisfied and thus could be considered “outstanding,” thereby suspending the time within which the State had to commence trial. Stated otherwise, the district court, in effect, granted its own discovery motion or continuance to allow defense counsel an opportunity before trial to .view the evidence. Because that extension was granted for Mr. Lewis’ benefit, it extended the time the State had to bring him to trial.
In finding no abuse of discretion, we find it significant, that Mr. Lewis failed to show any prejudice as a result of the delay. The lack of prejudice to the. defendant is one of the factors considered, in deciding whether a defendant’s constitutional right to a- speedy trial has been violated. Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972) (identifying four factors to be considered — “[ljength of delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant”). The lack of prejudice to Mr. -Lewis buttresses our finding that the district court did not abuse its discretion in denying his motion to quash. For all these reasons, we find this assignment lacks merit.

Assignment of Error Number Two

Mr. Lewis’ second assignment is that “[t]he district court erred in refusing to grant a mistrial when the State declined to call a witness whom the State 'had promised in opening statement would testify to an oral confession Mr. Lewis had allegedly made to him in prison.” ■ The prosecutor made this statement toward the end of opening statement; particularly, the prosecutor told the jury the following about Mr. Lewis’ jailhouse confession to Norman Trahan:
Mr. Trahan will take this stand and tell you about a conversation that he had with Billy Lewis in 2014. At that time, Mr. Lewis told him that he believed he was getting away with murder; that Itfihe had two bodies on him, Travis Webb and Daveron [sic]. Those two bodies, he felt, he knew, he was confident he was getting away with murder[,]
To place this issue in context, a brief review of the record is required.
Three days before trial, the State filed its notice to use Mr. Lewis’ oral confession. The State’s notice indicated that the confession was made to a known witness in Orleans. Parish Prison between October and December 2014. On September 10, 2015, Mr. Lewis opposed the use of the confession on the basis that the notice was untimely and that it failed to provide specific information required by La. C.Cr.P. art. 716(B). On .the next day, the State amended its notice by naming the witness as Mr. Trahan.
On the first day of trial, which was September 15, 2015, the defense filed several motions, including a motion to continue the trial to investigate the facts and circumstances of the confession and a motion to exclude the evidence. In support, the defense claimed that the State was in possession of the information as early as January of 2015, yet waited until the eleventh hour to inform the defense. Denying that it was in possession of the confession before it notified the defense, the State refuted the defense’s argument. In addition, the State advised the district court that it had not offered Mr. Trahan any deal in exchange for his testimony. The district court denied the defense’s motion to exclude the confession at trial. The next day, before the taking of evidence, the district court once again denied the defense’s motion for a continuance, a mistri *213 al, and an exclusion of Mr. Trahan’s testimony.
At various points during trial, the defense repeated its objection to the introduction of Mr. Trahan’s testimony. On the last day of trial, the State revealed that it had recently learned of additional information from another source that it should have disclosed to the defense. Ultimately, the State advised the district 11ficourt that it would not call Mr. Trahan to testify. As a result, the State argued that the defense’s motions for mistrial, for exclusion of the evidence, and for continuance were moot. Arguing the State’s reference to Mr. Trahan in its opening statement prejudiced Mr. Lewis because the jury would not hear from Mr. Trahan during trial, the defense maintained that the motions were not moot. The district court disagreed.
On appeal, Mr. Lewis contends that the prosecutor’s reference in opening statement to Mr. Trahan’s anticipated, but never introduced, testimony concerning Mr. Lewis’ confession to the murders of Travis and Davieon was so prejudicial as to require that his conviction be vacated. A “mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant.” State v. Leonard, 05-1382, p. 11 (La. 6/16/06), 932 So.2d 660, 667. The governing statutory provisions on mistrial are La. C.Cr.P. art. 770, 771, and 775. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” State v. Wessinger, 98-1234, p. 24 (La. 5/28/99), 736 So.2d 162, 183.
A prosecutor’s reference during opening statement to evidence that is ultimately not admitted can, in some instances, require reversal. State v. Bell, 279 So.2d 164 (La. 1973). The general rule, however, is that, “absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible is not a ground for a mistrial.” State v. Green, 343 So.2d 149, 151 (La. 1977). The prosecutor’s opening statement is not evidence and has no probative force. Rather, it is designed to inform the jury so that they may understand the evidence as it unfolds and to | ^protect the defendant from surprise. La. C. Cr. P. art. 766; State v. Shaffer, 260 La. 605, 267 So.2d 121 (1971); State v. Kreller, 255 La. 982, 233 So.2d 906 (1970).
The scenario presented here is similar to the one presented in State v. Scott, 454 So.2d 851 (La. App. 5th Cir. 1984). There, the prosecutor stated in his opening statement that a police officer would testify that he used a license plate number to determine that the getaway vehicle in an armed robbery belonged to the defendant. The license plate number was never introduced in evidence. Finding no reversible error, the court in Scott explained:
Article 766 of the Louisiana Code of Criminal Procedure states that the State’s opening statement shall explain the nature of the charge and set forth, in general terms, the nature of the evidence by which the State expects to prove the charge. In State v. Green, 343 So.2d 149, 151 (La.1977), the court stated:
The general rule is that, absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later ruled inadmissible is not a ground for a mistrial. The rule takes into account that proof frequently falls short of professional expectations.
Scott, 454 So.2d at 853.
Similarly, in Shaffer, supra, in which four defendants were tried and convicted *214 of aggravated rape, the State declared in its opening statement that it would show that the medical findings in the case were compatible with rape and recent sexual intercourse. After the State rested its case, the defendants moved for a mistrial on the ground that they were prejudiced because no evidence had been offered as to those medical findings. Rejecting this argument, the Supreme Court reasoned that an opening statement has no probative force and that the failure to produce the medical evidence raised only a question of sufficiency of the proof, which was not a ground for a mistrial. See La. C.Cr.P. art. 775.
| isHere, the prosecution intended to present Mr. Trahan’s testimony regarding the jailhouse confession at trial. Subsequent to opening statements, the prosecution learned of information not previously contained in its file to which the defense was entitled. The State tendered that information to the defense on the third day of trial, acknowledged the late disclosure and the merit of the defense’s motion to exclude Mr. Trahan’s testimony, and decided that it would not present Mr. Tra-han’s testimony at trial. These facts preclude a finding of bad faith on the part of the prosecutor.
Moreover, Mr. Lewis has failed to show clear and substantial prejudice that would entitle him to a new trial. The district court cautioned the jury both at the beginning of trial, and at the time the case was released to them for deliberation that opening statements are not evidence. It is hard to imagine that Mr. Lewis could have been prejudiced by the exclusion of the evidence of a jailhouse confession. It is more likely that the jury would have viewed the State’s case in a less favorable light for its failure to present evidence it had “promised” the jury at the beginning of trial, Indeed, the Louisiana Supreme Court in State v. Johnson, 226 La. 30, 44-45, 74 So.2d 402, 407, in addressing a similar issue, noted this logical conclusion, stating:
[T]he mere fact that the district attorney mentioned it in his opening statement and did not offer it in evidence does not supply a sound predicate for concluding that appellant sustained injury thereby. Albeit, we know of no rule of law which requires that the State offer all evidence referred to by the prosecutor in his opening statement or any jurisprudence holding that the accused necessarily suffers prejudice if he does not. Quite the contrary, it would be more logical and reasonable to conclude that the failure or inability of the State to elicit any evidence outlined in the opening statement redounds to the advantage and benefit of the accused.
19Id.; see also State v. Augustine, 241 La. 761, 772, 131 So.2d 56, 60 (1961) (quoting Johnson, supra). Thus, it is more logical to conclude the State’s failure to introduce the alleged jailhouse confession redounded to Mr. Lewis’ benefit. We thus find no error in the district court’s denial of Mr. Lewis’ motion for a mistrial.
Mr. Lewis also complains of prejudice based on the trial testimony of Ms. Varnado, Travis’ mother, that Mr. Lewis admitted to a witness that he had killed her son. Mr. Lewis contends that Ms. Var-nado improperly alluded to Mr. Trahan’s anticipated testimony.
At trial, Ms. Varnado was the State’s first witness. During cross-examination, defense counsel posed questions to Ms. Varndao regarding what she saw on the night of the crime and was trying to impeach her with her testimony from the first trial. Defense counsel questioned Ms. Varnado about the fact that she had never given a description to the police of either of the men that she saw running from the *215 scene through the window. After insisting that she had given a description to the police and then being shown that she had not, Ms. Varnado stated: “It may not be in be in the transcript but he already admit [sic] to doing what he did. Okay, he admit to someone. So when you get your other witness in here you can find out.”
As the State emphasizes, Ms. Var-nado’s testimony was given in response to defense counsel’s questioning of her on cross-examination. Ms. Varnado never identified Mr. Trahan as “the other witness” who would testify that Mr. Lewis confessed to the murders. Moreover, defense counsel failed to lodge an objection at any time during the trial to Ms. Varna-do’s statement or to move for a mistrial based on this testimony. See La. C.Cr.P. art. 841. Regardless, assuming, arguendo, either that the claim was preserved for appellate review or that a mistrial was Unwarranted under article 770, 771, or 775, or both, the district court’s failure to grant a mistrial would not result in an automatic reversal of Mr. Lewis’ conviction; it would constitute a trial error subject to the harmless error analysis on appeal. State v. Givens, 99-3518, p. 12, n. 8 (La. 1/17/01), 776 So.2d 443, 453. Trial error is harmless where the verdict rendered is “surely unattributable to the error.” State v. Johnson, 94-1379, p. 18 (La. 11/27/95), 664 So.2d 94, 102.
Here, Mr. Lewis failed to state how he was prejudiced by Ms. Varnado’s statement, considering that her statement was elicited by the defense coupled with the fact that she did not identify Mr. Trahan as the witness to whom Mr. Lewis had confessed. Moreover, the prosecution presented evidence that the victim, Travis, made dying declarations to three people— Ezekial, Sergeant Seuzeneau, and Detective Sloan — each time identifying Mr. Lewis as the shooter. Given the testimony of these three witnesses, it cannot be said the verdict in this case was attributable to any error. Based upon the record in this case, Mr. Lewis has failed to show he suffered prejudice warranting reversal of his conviction. This assignment lacks merit.

Assignment of Error Number Three

Mr. Lewis’ third, and final, assignment of error is that the non-unanimous jury verdict violated his right to a jury trial under the Sixth and Fourteenth Amendments. The Louisiana Supreme Court has previously rejected this same argument. In State v. Bertrand, 08-2215, p. 6 (La. 3/17/09), 6 So.3d 738, 742, the Supreme Court stated that under current jurisprudence from the United States Supreme Court, non-unanimous twelve-person jury verdicts do not violate the Sixth and Fourteenth Amendments. Rejecting a similar argument, this court recently stated:
21In State v. Bertrand, 2008-2215, pp. 6-7 (La. 3/17/09), 6 So.3d 738, 742, the Louisiana Supreme Court held that non-unanimous jury verdicts were not unconstitutional. The Court noted that La. C.Cr.P. art. 782 “withstands constitutional scrutiny,” and the Court refused to assume that the United States Supreme Court’s “still valid determination that non-unanimous twelve-person jury verdicts are still constitutional may someday be overturned.” Id., 2008-2215 at p. 8, 6 So.3d at 743. See also State v. Barbour, 2009-1258, p. 16 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1151, writ denied, 2010-0934 (La. 11/19/10), 49 So.3d 396, cert. denied, 562 U.S. 1217, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011) (rejecting a defendant’s argument that a non-unanimous jury verdict violated the Fifth, Sixth and Fourteenth Amendments, and noting “Bertrand is dispositive of defendant’s argument in this assignment of error which we find *216 is meritless.”); State v. Frith, 2013-1133, pp. 18-19 (La.App. 4 Cir. 10/22/14), 151 So.3d 946, 957 (finding that a defendant failed to meet his burden of proving either that La. Const. art. I, § 17(A) or La.C.Cr.P. art. 782(A) is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment' in a challenge to Louisiana’s system allowing non-unanimous jury verdicts).
State v. Hickman, 15-0817, pp. 13-14 (La. App. 4 Cir. 5/16/16), 194 So.3d 1160, 1168-69. For the same reasons, we find this assignment lacks merit.
DECREE
For the forgoing reasons, the defendant’s convictions and sentences are affirmed.
AFFIRMED
BELSOME, J., DISSENTS IN PART WITH REASONS AND CONCURS IN PART

. On May 20, 2009, Mr. Anderson pled guilty to manslaughter under North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); he was sentenced to ten years.

. Tierra testified that she did not remember anything until she woke up on the floor and discovered that she had been shot in the hand, face, and chest. She explained that Travis’ best friend Ezekial drove Tierra and Travis to Lakeland Hospital. She again lost consciousness when she arrived at the hospital and woke up two weeks later in Charity Hospital, where she had undergone numerous surgeries for her injuries.

. The 911 operator testified at trial that the first 911 call from the crime scene was received at 11:09 p.m., July 24, 2002.

. The green Mustang that Mr. Sutton owned was a very distinct vehicle. It was described as a lime or loud green car.

. Travis lived about a month; however, he never was released from the hospital. As Travis convalesced, Ezekial testified that he visited and spoke with him almost every day until Travis’ death. Pathologist Dr. Gerald Liuzza performed an autopsy on Travis' body. Dr. Liuzza noted a gunshot wound to the front of the abdomen, left of mid-line. The bullet entered from the left side of Travis' body, passed through portions of the colon, small intestine, stomach, and liver, and exited the right flank area, just below the rib cage. In addition, Dr. Liuzza noted two wounds on the back of Travis’ right forearm. The body also exhibited a gaping surgical incision through the abdominal wall, created when emergency room physicians performed a laparotomy to repair the abdominal wound. Dr. Liuzza described findings of a tracheostomy, urinary catheter and intravenous lines. Dr. Liuzza noted the internal organs were badly infected by the gunshot, and he related all of Travis’ injuries to the gunshot wounds. Dr. Liuzza, like the corner, classified Travis’ death as a homicide.

. The letter in question is undated and unsigned. The envelope accompanying the letter is post marked September 3, 2002, and addressed to "Tricey Lewis” with a return address of: "Billy Lewis #1104, H.O.D. S-3-8 Floor, 3000 Perdido Street, New Orleans, La. 70119.” In the letter, the writer enlists the aid of a female, directing her to call CrimeStop-pers and report that Keland "Jimmy” Milton was Ronald Anderson’s accomplice in these shootings.

. In every criminal case, we review the record for errors patent. In this case, we found none.

. The Louisiana Supreme Court likewise denied Mr. Lewis' writ application seeking review of the denial of his motion to quash. State v. Lewis, 15-0630 (La. 5/22/15), 171 So.3d 252.